**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**July 31, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP414**

Cir. Ct. No. 2020CV346

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

BRIAN LAFFERTY AND KATIE LAFFERTY,

PLAINTIFFS-APPELLANTS,

V.

JEFF PERTL AND JULIE DRISCOLL,

DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Washington County: JAMES K. MUEHLBAUER, Judge. *Reversed and remanded with instructions*.

Before Neubauer, P.J., Gundrum, and Lazar, JJ.

¶1 LAZAR, J.

The very enumeration of the right [in the Second Amendment] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future

> judges' assessment of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope is too broad. ... And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).

¶2 Appellants and foster parents, Brian and Katie Lafferty appeal the circuit court's order on cross-motions for summary judgment executed in favor of respondents Jeff Pertl and Julie Driscoll[1] as well as the court's decision and order denying the Laffertys' motion for a protective order. The Laffertys have been seeking to exercise their state and federal constitutional rights for five years while the Wisconsin Department of Children and Families (DCF) and Washington County Human Services Department (the County) have dithered, moved the goal posts, and changed the rules of the game every step along the way.

¶3 The Laffertys' current appeal challenges several regulations in or related to WIS. ADMIN. CODE § DCF 56.08 (Dec. 2015)[2] regarding the renewal of

---

[1] The underlying complaint was filed against respondents Emilie Amundson, who at the time was the Secretary of Wisconsin's Department of Children and Families (DCF), and Julie Driscoll, the Director of the Washington County Human Services Department (the County), both named in their official capacities. When Jeff Pertl replaced Amundson as the new DCF Secretary, he was automatically substituted as a party in February 2026 pursuant to WIS. STAT. § 803.10(4) (2023-24). For ease of reference, Pertl shall be referred to as the DCF and Driscoll as the County unless the reference is to their individual actions.

All references to the Wisconsin Statutes are to the 2023-24 version.

[2] *See* 720 Wis. Admin. Reg. (Dec. 2015), https://docs.legis.wisconsin.gov/code/register/2016/726b/remove/dcf56.pdf (last visited June 24, 2026). All references to WIS. ADMIN. CODE are to the December 2025 Register unless otherwise noted.

their foster home license, which they contend are facially unconstitutional. In 2020, Washington County began to require compliance with additional restrictions before a license could be renewed, including: (1) a storage requirement that mandated firearms be stored, in a location not readily accessible to children, locked and unloaded in the home and in a separate location from ammunition; (2) a carry ban that prohibited a foster parent with a conceal carry license from carrying a weapon in the presence of foster children; and (3) a disclosure requirement that mandated foster parents must list all firearms currently (and some formerly) owned, and to identify their locations and the separate location of ammunition. The Laffertys assert that the circuit court erroneously granted summary judgment against them on procedural grounds, and that the various rules and regulations imposed upon them by the County and/or the DCF violate their federal and state constitutional Second Amendment rights. *See* U.S. CONST. amend II; WIS. CONST. art. I, § 25.

¶4      The DCF[3] disputes all of the Laffertys' arguments and further asserts the Laffertys waived their Second Amendment challenges when they sought to become foster parents. Due to the complexity of the issues presented, in mid-December 2025, we set the matter for an oral argument to be held in February 2026. Seven days before that argument, DCF's counsel wrote to advise this court that the administrative rule at issue had been amended three months earlier, effective December 1, 2025. The DCF asserted the appeal was now moot.

---

[3] The County did not file briefs in this appeal. Instead, it asserts that "[its] interests are adequately represented [by the DCF]."

¶5 We immediately cancelled the oral argument and ordered supplemental briefing to determine what issues, if any, remained for this court to resolve. The Laffertys assert the rule amendment does not render this appeal moot and that their rights were and are still being violated. The DCF asserts that there is at least one issue that requires our resolution. We agree that viable issues remain before this court; therefore, this appeal is not moot. As to the merits presently before us, we conclude the Laffertys did not waive their constitutional rights by volunteering to serve as foster parents. We further conclude the disclosure requirement and discovery demands were overly broad and impermissible. However, we also conclude the most recent rule change eliminates some of the Laffertys' complaints, especially with respect to concealed carry and storage requirements. We also conclude the requirement that foster parents' firearms be stored unloaded as a condition of obtaining a foster parent license violates both the federal and state constitutions and must be struck from the administrative rule.

¶6 Finally, we conclude the DCF's belated notice to this court of the administrative rule change, mid-stream and mere days before the oral argument date, raises serious concerns that we address below.

¶7 Accordingly, we reverse and remand with instructions.

## BACKGROUND

¶8 The Laffertys live in Washington County. Brian Lafferty was first exposed to, and began using, firearms as a young child. He has had a concealed carry permit for at least eight years. The Laffertys own several firearms that they store in their home together with ammunition. They have several digital lock safes in their home. They use the firearms for self-defense, target shooting, and recreation.

¶9 2011 Wis. Act 35, known colloquially as the Concealed Carry Law, was enacted into law on July 8, 2011. *See* WIS. STAT. § 175.60; ***Wisconsin Carry, Inc. v. City of Madison***, 2017 WI 19, ¶11, 373 Wis. 2d 543, 892 N.W.2d 233 (explaining that Act 35, codified into the statutes, allows individuals to "obtain[] a license to carry concealed weapons").

¶10 The Wisconsin foster care system is administered by the DCF pursuant to WIS. STAT. § 48.48, which partners with county governments and private entities. Sec. 48.48(1), (9). In order to operate a foster home, the parent(s) must obtain a license. WIS. STAT. § 48.62(1). The DCF, counties, and licensed child welfare agencies are enabled to issue foster home licenses. WIS. STAT. §§ 48.48(9), 48.61(7).

¶11 The DCF promulgates administrative rules establishing the requirements for foster home licenses that counties and other agencies must follow. WIS. STAT. §§ 48.67(1m), 48.75(1d). These rules, set forth in WIS. ADMIN. CODE § DCF ch. 56, were

> promulgated ... to establish licensing requirements for foster homes and foster parents directed at protecting the health and safety and promoting the welfare of children placed in the homes; … [and] to establish requirements for

> certification of a foster home with a level of care and requirements for assessment of a child's needs and strengths[.]

WIS. ADMIN. CODE § DCF 56.01(1). The rules regulate a multitude of issues in the foster home, including safety plans, sleeping arrangements, pets, physical restraints, chores, discipline, and, relevant to this appeal, firearms and other dangerous weapons. *See* WIS. ADMIN. CODE §§ DCF 56.07, 56.072, 56.076, 56.08 (Dec. 2015), and 56.09.

¶12    When the Laffertys filled out their initial foster home license application in March 2016, the relevant provision in that form read as follows:

> 56.08    (5)    Firearms and Other Weapons
>
> > I agree to keep all firearms or other dangerous weapons in the home unloaded and locked in an area inaccessible to foster children, except as provided in [WIS. ADMIN. CODE § DCF] 56.08(5)(d) (Dec. 2015) regarding law enforcement officers.[4]  (5)(a), (b) and (c).
> >
> > … I have read, understand and will comply with 56.08(5)(c) regarding a foster child's use of firearms or bows.

The application did not require that firearms and ammunition be stored separately, but it did reference the administrative rule which, at that time, did have that requirement. It did not mention concealed carry rights.

---

[4] Neither of the Laffertys are law enforcement officers.

¶13    In March 2016, Wis. Admin. Code § DCF 56.08(5) (Dec. 2015)[5]

provided the following restrictions:

> **(5)** FIREARMS AND OTHER WEAPONS. (a) Except as
> allowed under par. (d), no loaded firearm may be kept in a
> foster home.
>
> (b) No unloaded firearm or other dangerous weapon
> may be kept in a foster home unless stored and locked in an
> area not readily accessible to foster children.  Ammunition
> materials and firearms shall be stored in separate locked
> areas that are not readily accessible to foster children.
>
> **Note**: A firearm need not be locked in an area not readily
> accessible to foster children if the firearm has been disassembled
> in such a manner that it is not operable.  Trigger locks alone do
> not meet the above requirement but may be a supplemental
> safety measure in addition to the firearm being stored and locked
> in an area not readily accessible to foster children.  A weapon
> cabinet with a glass front is not considered secure, even if it can
> be locked.

Absent from the administrative code provision at that time was any mention of

concealed carry rights.

¶14    The Laffertys agreed to the limited firearm restriction, as well as the

other general requirements, on their initial application and were issued their foster

home license in September 2016.  Their two-year foster home license was twice

renewed, the last time in 2020 in the midst of the controversy at issue in this

appeal.  In all the years they were licensed to operate a foster home, there have

been no complaints or allegations of rule infractions against the Laffertys.

---

[5] *See* 720 Wis. Admin. Reg. (Dec. 2015), https://docs.legis.wisconsin.gov/code/register/2016/726b/remove/dcf56.pdf (last visited June 24, 2026).

¶15     When the Laffertys sought to renew their foster home license in the summer of 2020, the County required that they sign an additional, new form entitled "Firearms and Other Weapons in a Foster Home" (hereinafter the County Form) as part of their renewal process.[6]  The County Form quoted an old version[7] of WIS. ADMIN. CODE § DCF 56.08(5) (Apr. 2015), which did not mention separate storage for ammunition, explained that the Concealed Carry Law (2011 Wis. Act 35) had been enacted on July 8, 2011, and advised foster parent applicants that:

> [i]f a foster parent holds a Conceal and Carry Permit, the foster parent is not permitted to carry a weapon on them while in the presence of foster children, with the exception of organized hunting outings.  The rules defined in DCF 56.08(5) remain in effect and apply to foster parents with Conceal and Carry Permits.  Foster parents must keep all weapons inaccessible to foster children.

The County Form also required applicants to "acknowledge that [they are] not allowed to carry a weapon while in the presence of foster children[,]" and that this requirement "remains in effect for foster parents with Conceal and Carry Permits." Applicants were also required to itemize (by type, storage location of the firearm, and storage location of ammunition) all firearms and ammunition they "currently own and possess[.]"

---

[6] The County first implemented the County Form in April 2019.

[7] For unknown reasons, the County Form quoted from a version of WIS. ADMIN. CODE § DCF 56.08(5)(b) that was only effective from May 1, 2015, through December 31, 2015. *See* 712 Wis. Admin. Reg. (Apr. 2015), https://docs.legis.wisconsin.gov/code/register/2015/720b/remove/dcf56.pdf (last visited June 24, 2026).  Paragraph (b) of that version did not mention the requirement of separate storage for ammunition that was in the administrative rule at the time the Laffertys were first asked to sign the County Form.

¶16    The Laffertys retained counsel, who mailed a "**Notice of Claim**" on July 27, 2020, to the County complaining of the "extra-regulatory rule that a foster parent with a [conceal and carry] permit may not carry a weapon on his or her person in the presence of a foster child." The attorney further noted that the administrative rule does not impose the restriction set forth in the County Form and demanded that the County rescind its "imposition of the regulation and the rule[.]" Because the Laffertys were pursuing a federal claim, their attorney explained they would be immediately filing a lawsuit. The underlying lawsuit was filed that same date.[8]

¶17    On July 30, 2020, the County denied the Laffertys' "claim" by written letter. In the denial letter, the County indicated that the Laffertys' application for a foster home license renewal would be denied unless they completed and signed the County Form. On July 31, 2020, the County's Foster Care and Kinship Care Coordinator (the Coordinator) emailed the Laffertys and explained that while the County Form was new, the rule was not and that the County Form "was created to make it clear what this code entails[.]" The Coordinator also drew a firm line in the sand:

---

[8] The initial complaint asserted two counts: (1) a 42 U.S.C. § 1983 action for violation of the Second Amendment; and (2) violations of WIS. CONST. art. 1, § 25. It sought declaratory and injunctive relief, as well as reasonable costs and attorney's fees. An amended complaint was filed four days later with two additional counts: (3) violations of WIS. STAT. § 66.0409(2); and (4) violations of WIS. STAT. § 175.60(2g)(a). A second amended complaint was filed, with circuit court leave, in December 2020. That complaint referenced the revised administrative code rule that required firearms and ammunition to be stored separately.

Pursuant to the circuit court's scheduling order, a third (and final) amended complaint was filed on July 18, 2023, that added a fifth count against the DCF under WIS. STAT. § 227.10(2m) for "implement[ing] a standard, requirement, or threshold ... that is not explicitly required or explicitly permitted by statute and has not been promulgated in accordance with [WIS. STAT.] ch. 227." The final complaint also sought reasonable costs and attorney's fees.

> [i]f you do not follow this rule we cannot relicense you as you are not willing to comply with all the requirements of [Wis. Admin. Code § DCF ch.] 56 [(April 2015)]. Your license expires at the end of August so I will need to know how you are wanting to proceed within the next few days/weeks. ... That leaves you with a few choices; close out your license, renew your license and abide by the rule, or renew your license and abide by the rule and continue to work with your attorney to have it changed at the State level.

The Coordinator also proposed a meeting or conference call with the Laffertys to discuss the situation further.

¶18 On August 18, 2020, the Laffertys met with the County's Coordinator and were, again, personally told that, even though their foster license could be renewed, they would not receive placement of any foster children while this lawsuit was pending. Still under protest, the Laffertys signed the County Form and submitted it to the County. During this meeting, the Laffertys were advised their foster home license would be renewed.

¶19 The Laffertys filed a motion for a temporary injunction on September 9, 2020, based upon the County's statements that it would not place foster children with the Laffertys while the lawsuit was pending, thus rendering their foster home license essentially moot.

¶20 On September 18, 2020, the County met again with the Laffertys and now advised them that it "would place foster children with them should an appropriate placement arise during the pendency of this litigation." The County explained that the Laffertys "will be considered as a potential placement option along with other eligible foster parents in the ordinary course of business."

¶21 The County, prior to the hearing on the motion for a temporary injunction, placed a foster child with the Laffertys on October 23, 2020, and then

argued to the circuit court that the motion was moot on that ground. The court agreed and denied the motion as moot by order dated November 9, 2020.

¶22    As the civil case was wending its way through the circuit court, the DCF filed a discovery request upon the Laffertys in November 2020 seeking detailed information on all firearms they had owned since 2016, to wit: "[f]or every firearm You have owned since You were first licensed as a foster home, state the make and model, caliber, year purchased, and whether you still own that firearm." The Laffertys objected to this request on the basis that "it exceeds the scope of discovery, it serves only to harass and annoy, it seeks information that is not relevant to the case, and it is disproportionate to the case." As the parties attempted to mediate the discovery dispute, the DCF asserted it was just trying to verify that the Laffertys had standing to bring the lawsuit.

¶23    When the parties were unable to resolve the discovery dispute, the Laffertys, in December 2020, filed a Motion for Protective Order. The circuit court, on April 5, 2021, entered a Decision and Order denying the motion and requiring the Laffertys to respond to the Interrogatory. The Laffertys complied.

¶24    The DCF and the Laffertys each filed motions for summary judgment in April and May 2021. The County joined the DCF's motion. The DCF filed three expert reports in support of its motion by: (1) Dr. Frederick P. Rivara; (2) Jónelle Q. Brom; and (3) Ronald W. Betley.[9]

---

[9] Rivara is a Professor of Pediatrics and an Adjunct Professor of Epidemiology at the University of Washington. Brom is a Wisconsin certified Advanced Practice Social Worker. Betley is an employee of the Wisconsin Department of Justice and is an Education Consultant in the Training and Standards Bureau who oversees tactical skills criteria for law enforcement academies.

¶25    As of January 2021, five foster children had been placed with the Laffertys.[10]

¶26    The circuit court issued a decision and order on the cross-motions for summary judgment on September 30, 2021, in which it found "that the failure of the Laffertys to store their firearms and ammunition in locked containers would pose a safety risk to foster children."  It considered whether "the Laffertys' Second Amendment rights can be waived and have been waived by contract because the imposed firearm restrictions are reasonable and 'rationally related' to the benefit of being granted a foster child care license."  The court granted the DCF and County's motions for summary judgment and denied the Laffertys' motion, finding that: (1) "the waiver is rationally related to the benefit received[;]" (2) "the cost of the firearm regulations is the specific limited restriction against having loaded firearms in the home and the specific limited conceal carry restriction against conceal carrying of firearms while in the presence of the foster children[;]" and (3) "the breadth of the firearm and ammunition restrictions imposed by the contractual waiver is narrow and relatively minor."  (Formatting altered; emphases omitted).  It further held:

> [t]his court finds that the waiver requirements in question are voluntary, rationally related to the safety of foster children, narrow in scope, and a minimal burden for foster parents.  The court finds that the waiver requirements are a **limitation, but not a ban, on possession of firearms and ammunition in the home and carry conceal rights.**  Accordingly, under the particular undisputed facts and circumstances present, the court finds that the contractual waiver is constitutional and enforceable.

---

[10] This number may be larger by the time of this second appeal, but the Record is unclear.

> With the court having determined that [the] Laffertys' waiver is constitutional and enforceable, the court does not reach the separate question of whether absent a valid waiver, the firearm and ammunition restrictions would be enforceable as reasonable restrictions consistent with the Second Amendment rights of foster parents.

¶27 The Laffertys timely appealed that order in November 2021.[11] After that appeal was fully briefed, the United States Supreme Court issued *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022), in which the Court rejected the means-end scrutiny framework the circuit court had relied upon in its first order. The *Bruen* court held that:

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17 (citation omitted).

¶28 Accordingly, "[w]e vacate[d] the circuit court's order and remand[ed] for additional proceedings to allow the parties to address the [DCF]'s rule in light of *Bruen* and to obtain the benefit of the circuit court's decision applying the *Bruen* standard." *Lafferty v. Amundson*, No. 2021AP1958, unpublished op. and order at 1 (WI App May 17, 2023).[12]

---

[11] The first appeal was *Lafferty v. Amundson*, No. 2021AP1958, unpublished op. and order (WI App May 17, 2023).

[12] We instructed the circuit court to "consider the interaction of *Bruen* and the unconstitutional conditions doctrine[,]" and to

(continued)

13

¶29    Upon remand to the circuit court, a new scheduling order was issued, and the Laffertys filed their third amended complaint in July 2023. The DCF filed a fourth expert report, by Saul Cornell,[13] in November 2023, and the Laffertys filed a motion to exclude that expert in May 2024.

¶30    Again, the Laffertys and the DCF filed cross-motions for summary judgment in May and July 2024. Again, the County joined the DCF's motion. This time, however, the County filed an affidavit advising the circuit court that it had been advised by the DCF that it "is no longer interpreting [WIS. ADMIN. CODE] DCF ch. 56 as prohibiting a licensed foster parent from carrying a weapon on them while in the presence of foster children if they have a valid permit." The County further averred it would no longer require applicants to fill out the County Form or enforce the carry restriction with respect to the Laffertys or any other County foster parent.[14]

¶31    On January 6, 2025, the circuit court issued a decision and order denying the motion to exclude expert Cornell. And, on January 21, 2025, the

---

permit the parties to address whether the form the Laffertys were required to sign in this case as a condition of being foster parents, which specifically prohibits a foster parent from carrying a weapon in the presence of a foster child, constitutes an administrative rule that has not been promulgated through the rulemaking process.

*Lafferty*, No. 2021AP1958 at 1 (referencing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)).

[13] Cornell is a Second Amendment scholar and teaches constitutional law at Fordham Law School.

[14] A DCF Administrator also sent out an email to all Wisconsin counties reiterating those positions on concealed carry for foster parents.

court issued a decision and order granting the DCF and the County's motions for summary judgment and denying the Laffertys' motion. The court began by noting that *United States v. Rahimi*, 602 U.S. 680, 692 (2024), further clarified the new standard set forth in *Bruen*.

¶32    The circuit court concluded that the carry ban had been rendered moot and found that "the Laffertys have freely, voluntarily, knowingly, and intelligently waived any objection to the storage limitation." As to the *Bruen* analysis, the court began by noting that "there is no Founding era regulation that is a perfectly matched historical twin to the challenged foster care regulation that requires safe storage of firearms in homes where foster children are present." The court concluded that the DCF and the County were "successful in demonstrating that the challenged firearm storage limitation is, indeed, '**consistent with this nation's historical tradition of firearm regulation**.'" Accordingly, the court granted the DCF and the County's motion for summary judgment and denied the Laffertys' motion.

¶33    The Laffertys again timely appealed.

## THE ADMINISTRATIVE RULE

¶34    Strikingly, the administrative rule at issue has changed significantly since it was first adopted.    Moreover, it has been amended most recently and obviously in response to this appeal.    In order to better understand the restriction itself and the delay in informing this court of the final amendment, it is necessary to outline the rule's history.

¶35    From 1987 through August 31, 1990, WIS. ADMIN. CODE § HSS[15] 56.05(1)(b) (July 1987) addressed firearms as part of the grab-bag of all potentially dangerous items.    It provided that: "(b) Potentially dangerous items including, but not limited to, household poisons, medicines, plastic bags, matches, knives and firearms shall not be kept where they are easily accessible to children." *Id.*    Notably, this provision linked other items the DCF now identifies as dangerous in its current foster home license application.[16]

---

[15] The DCF used to be called the Department of Health and Social Services.  The rule effective 1987 through August 31, 1990 stated that "[t]he purpose of [that] chapter [was] to protect and promote the health, safety and welfare of children in family foster care."  WIS. ADMIN. CODE § HSS 56.01(1); 379 Wis. Admin. Reg. (July 1987), https://docs.legis.wisconsin.gov/code/register/1990/416b/remove/hss56.pdf (last visited June 24, 2026).

[16] The application also seeks "Safety" information, pursuant to [WIS. STAT. §] 56.08(1), generally as follows:

I have the following items out of children's reach or locked up:

☐ Flammable or combustible materials
☐ Plastic bags
☐ Cleaning supplies, detergents, poisons and insecticides
☐ Medications/drugs/alcohol
☐ Matches, cigarette lighters, tobacco products
☐ Power tools – (1)(a)

(continued)

¶36 From September 1990 through 2008, the administrative rule, still under the Health and Human Services chapter, was amended to include a new provision regarding firearms and other weapons; that new section, WIS. ADMIN. CODE § HHS 56.06 (Aug. 1990) Safety, required the following:

> (5) FIREARMS AND OTHER WEAPONS. (a) Except as allowed under par. (c) [regarding law enforcement], no loaded or otherwise dangerous weapon may be kept in a foster home. Unloaded firearms and other dangerous weapons shall be stored and locked in an area not readily accessible to foster children. Ammunition shall be stored and locked separately from weapons in an area not readily accessible to foster children.[17]

*Id.*

¶37 In March 2002, paragraph (a) was slightly reworded and divided into two paragraphs and the following "**Note**" was added to the rule:

> **Note**: A firearm need not be locked in an area not readily accessible to foster children if the firearm has been disassembled in such a manner that it is not operable. Trigger locks alone do not meet the above requirement but may be a supplemental safety measure in addition to the firearm being stored and locked in an area not readily accessible to foster children.[18]

WIS. ADMIN. CODE § HFS 56.08(5)(b) (Feb. 2002).

---

> I will make every reasonable effort to identify and immediately correct any hazards to the safety of the foster children on my premises or being transported. (1)(b).

[17] 416 Wis. Admin. Reg. (Aug. 1990), https://docs.legis.wisconsin.gov/code/register/1995/474b/remove/hss56.pdf (last visited June 24, 2026).

[18] 554 Wis. Admin. Reg. (Feb. 2002), https://docs.legis.wisconsin.gov/code/register/2003/576b/remove/hfs56.pdf (last visited June 24, 2026).

¶38    In 2008, the code chapter was changed to Department of Children and Families, but the text generally remained the same until October 2010, when the requirement of separate storage for ammunition was deleted.[19]  WIS. ADMIN. CODE § DCF 56.08(5)(b) (Sep. 2010).  That provision ultimately was added back[20] as of January 1, 2016, and remained until December 1, 2025, when the rule was repealed and completely revised, most likely in response to this appeal.[21]

---

[19] 657 Wis. Admin. Reg. (Sep. 2010), https://docs.legis.wisconsin.gov/code/register/2011/668b/remove/dcf56.pdf (last visited June 24, 2026).  The new paragraph 56.08(5)(b) read:

> (b) No unloaded firearm or other dangerous weapon may be kept in a foster home unless stored and locked in an area not readily accessible to foster children.  Ammunition materials and firearms shall be stored in locked areas that are not readily accessible to foster children.

[20] 726 Wis. Admin. Reg. (June 2016), https://docs.legis.wisconsin.gov/code/register/2017/733b/remove/dcf56.pdf (last visited June 24, 2026).

[21] The Wisconsin Administrative Register detailed the alterations the DCF was seeking from the prior WIS. ADMIN. CODE § DCF 56.08(5) (Nov. 2025).  839B Wis. Admin. Reg. (Nov. 24, 2025), https://docs.legis.wisconsin.gov/code/register/2025/839b/register/final/cr_25_043_rule_text/cr_25_043_rule_text (last visited June 24, 2026).  It explained, with respect to "[f]irearms and other dangerous weapons[,]" what the changes would accomplish:

> Repeals the prohibition on a loaded firearm in the foster home and instead allows a foster parent to *carry a concealed handgun* in the presence of a foster child if the foster parent has a license to carry a concealed weapon and carries the handgun using a holster or carry system that ensures that the firearm is in the control of the foster parent at all times.

> Maintains the requirement that a firearm be stored unloaded and locked in an area not readily accessible to a foster child and modifies additional storage provisions from requiring that ammunition be stored in a separate locked area to instead requiring that a *firearm either be stored* in a gun safe with ammunition allowed *or* one or more of the following: with ammunition locked in a container separate from the firearm, with the trigger lock engaged on the firearm, or with the cable lock engaged on the firearm.

(continued)

18

Sec. DCF 56.08(5)(b) (June 2016); *See, e.g.*, WIS. ADMIN. CODE § DCF 56.076(5)(a).

¶39 The administrative rule now more fully defines "dangerous weapon" and addresses firearm and ammunition storage as well as conceal carry rights. It reads as follows:

> **(1)** DEFINITION. In this section, "dangerous weapon" means any firearm, any electric device designed to immobilize or incapacitate persons by the use of electric current, any spray device designed to immobilize or incapacitate persons by the use of chemicals or other liquids or gases, any device designed as a weapon and capable of producing death or great bodily harm, or any other device or instrument that is calculated or likely to produce death or great bodily harm.

> **(2)** LAWS. A foster parent shall comply with all federal, state, and local laws relating to the possession, transportation, and carry of a dangerous weapon.

> **(3)** SAFE STORAGE OF FIREARMS. A foster parent who is not actively using, transporting, or cleaning a firearm, or exercising their right to carry a concealed handgun under sub. (5), shall store the firearm as provided in par. (a) and either par. (b) or (c) as follows:

> (a) Unloaded and locked in an area that is not readily accessible to a foster child.

> (b) With one or more of the following secondary safety measures used:

> 1. Ammunition is locked in a container separate from the firearm.

> 2. Trigger lock is engaged on the firearm.

> 3. Cable lock is engaged on the firearm.

---

*Id.*

(c) In a gun safe made of steel with a secure functioning biometric, electronic, or combination locking mechanism that is designed to store firearms and ammunitions. Ammunition may be locked in the gun safe with the firearm.

**(4)** SAFE STORAGE OF OTHER DANGEROUS WEAPONS. A dangerous weapon other than a firearm shall be stored in a locked area that is not readily accessible to a foster child.

**(5)** CARRYING A CONCEALED HANDGUN.

(a) A foster parent may carry a concealed handgun in the presence of a foster child if the foster parent has a license to carry a concealed weapon under [WIS. STAT. §] 175.60, and carries the handgun using a holster or carry system that ensures that the firearm is in the control of the foster parent at all times.

(b) Notwithstanding the license requirement in par. (a), a foster parent may carry a concealed handgun without a state license in accordance with 18 [U.S.C. §] 926B and 18 [U.S.C. §] 962C and other applicable law.

**(6)** HUNTING. A foster parent may allow a foster child to hunt in compliance with [WIS. STAT. §§] 29.591 or 29.592, and other applicable law, based on the reasonable and prudent parent standard.

WIS. ADMIN. CODE § DCF 56.076(1)-(5).

## STANDARD OF REVIEW

¶40   We review a circuit court's "summary judgment decision[] de novo, applying the same method employed by the [circuit] court." ***Koepsell's Olde Popcorn Wagons, Inc. v. Koepsell's Festival Popcorn Wagons, Ltd.***, 2004 WI App 129, ¶2, 275 Wis. 2d 397, 685 N.W.2d 853. "[S]ummary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." ***M & I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.***, 195 Wis. 2d 485, 497, 536 N.W.2d 175 (Ct. App. 1995); *see* WIS. STAT. § 802.08(2). "Generally, when both parties file cross-motions for

20

summary judgment, it is the equivalent of a stipulation of facts permitting the case to be decided solely on the legal issues presented." *Carlin Lake Ass'n v. Carlin Club Props., LLC*, 2019 WI App 24, ¶19, 387 Wis. 2d 640, 929 N.W.2d 228.

¶41 "The construction of an administrative rule is a question of law which we review independently." *Envirologix Corp. v. City of Waukesha*, 192 Wis. 2d 277, 291, 531 N.W.2d 357 (Ct. App. 1995). It follows the same interpretative framework for statutes as set forth in *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110. *See Envirologix*, 192 Wis. 2d at 291 ("The rules of statutory construction apply to the construction of an administrative rule.").

¶42 "'The constitutionality of a statute is [also] a question of law which we review *de novo*.'" *Appling v. Walker*, 2014 WI 96, ¶17, 358 Wis. 2d 132, 853 N.W.2d 888 (citation omitted); *Coulee Cath. Schs. v. LIRC*, 2009 WI 88, ¶31, 320 Wis. 2d 275, 768 N.W.2d 868. "The party challenging the constitutionality of a statute 'must prove beyond a reasonable doubt that the act is unconstitutional.'" *Appling*, 358 Wis. 2d 132, ¶17 (quoting *Georgina G. v. Terry M.*, 184 Wis. 2d 492, 515, 516 N.W.2d 678 (1994)). Not only that, "every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality." *Appling*, 358 Wis. 2d 132, ¶17 (citation omitted).

¶43 In a facial constitutional challenge—one of "the most difficult ... to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745 (1987)—the plaintiffs must establish that the rule violates the Second Amendment "in all its applications." *See Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). To prevail, the plaintiffs must show there are "no set of circumstances" where the rule can be

constitutionally applied. *Salerno*, 481 U.S. at 745. "A facial challenge to the constitutionality of a statute presents a question of law that we review independently[.]" *Mayo v. Wisconsin Injured Patients & Fams. Comp. Fund*, 2018 WI 78, ¶23, 383 Wis. 2d 1, 914 N.W.2d 678.

## DISCUSSION

¶44    The Second Amendment has been the subject of a multitude of decisions, including a series by the United States Supreme Court starting with *Heller* and culminating most recently in *United States v. Hemani*, 608 U.S. ___, 146 S. Ct. 1677 (2026), and *Wolford v. Lopez*, 609 U.S. ___, 146 S. Ct. 79 (2026). As with all interpretation questions, we look first to the actual text. *See Kalal*, 271 Wis. 2d 633, ¶45.

¶45    While many people often and simplistically parrot that the Second Amendment is a right to bear arms, the text is more all-encompassing:

> A well regulated Militia, being necessary to the security of
> a free State, the right of the people to keep and bear Arms,
> shall not be infringed.

U.S. CONST. amend. II.

¶46    "In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (alternation in original; citation omitted). Justice Antonin Scalia, in contemplating the meaning of the Second Amendment, notes that it is "naturally divided into two parts"—a prefatory clause which strives to "announce[] a purpose" and an operative clause that carries out the command of that stated purpose. *Id.* at 577-78. Thus, *Heller* asserts, "[t]he Amendment could

be rephrased, '[b]ecause a well regulated Militia is necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.'" *Id.* at 577 (citation omitted). This intrinsic underpinning of the people's right has consistently driven the panoply of decisions that have followed *Heller*.

¶47   The Court in *Heller* further explains that Americans—and that must necessarily include foster parents—have that substantial right "to *keep* and bear Arms[.]" *Id.* at 581 (emphasis added). The right to "keep Arms" is naturally read as a right to "have weapons." *Id.* at 582. The Court concluded that the right "to bear Arms" naturally meant to "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584 (omissions in original; citation omitted). "The right to keep and bear arms is an individual 'core' right protected and is a 'right of law abiding, responsible citizens to use arms in defense of hearth and home.'" *State v. Christen*, 2021 WI 39, ¶25, 396 Wis. 2d 705, 958 N.W.2d 746 (quoting *Heller*, 554 U.S. at 635). "Th[is] right applie[s] to ordinary citizens within the home." *Rahimi*, 602 U.S. at 691.

¶48   As with any right, however, it is not absolute or unlimited. *Heller*, 554 U.S. at 626; *Christen*, 396 Wis. 2d 705, ¶25. The Second Amendment right "was never thought to sweep indiscriminately." *Rahimi*, 602 U.S. at 691. Courts are forever required to dance across tightropes in situations like these where the right is subject to state laws. As the Court in *Heller* explains:

> nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626-27.

¶49 Not only is the Second Amendment applicable to state and local governments via the Fourteenth Amendment, U.S. CONST. amend XIV, as held in *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010), and explained in *Christen*, 396 Wis. 2d 705, ¶25, but our state constitution provides additional guarantees:

> The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose.

WIS. CONST. art. 1, § 25. Our supreme court has held that

> [i]f the constitutional right to keep and bear arms for security is to mean anything, it must, as a general matter, permit a person to possess, carry, and sometimes conceal arms to maintain the security of his private residence or privately operated business, and to safely move and store weapons within these premises.

*State v. Hamdan*, 2003 WI 113, ¶68, 264 Wis. 2d 433, 665 N.W.2d 785.

¶50 Here, the Laffertys appear to assert their right to keep and bear arms has been rendered hollow by the rules and requirements set out by the DCF and the County. That may well have been the case—initially. But, due to the filing and prosecution of this lawsuit, many of the potential infringements of their rights have been eliminated. At the very least, the issues have narrowed.

**I. The County Form issue is moot, but there are still issues to be resolved on appeal.**

¶51 Due to the ever-shifting sands in this case, we must first address whether there are any actual issues left in this current appeal to be resolved by this court. Issues become "'moot when [their] resolution will have no practical effect

on the underlying controversy.'" ***State v. Fitzgerald***, 2019 WI 69, ¶21, 387 Wis. 2d 384, 929 N.W.2d 165 (citation omitted). We "generally decline to reach the merits of an issue that has become moot." ***PRN Assocs. LLC v. DOA***, 2009 WI 53, ¶29, 317 Wis. 2d 656, 766 N.W.2d 559. "Mootness is a question of law that this court reviews de novo." ***Wisconsin State J. v. Blazel***, 2023 WI App 18, ¶41, 407 Wis. 2d 472, 991 N.W.2d 450. Issues that were viable when the appeal was filed, or even throughout the majority of the appeal, may still become moot during the appeal's pendency. That is precisely what happened here with respect to several issues.

¶52     Both parties must agree, as the DCF asserts, that "[t]his case has narrowed significantly since it began more than five years ago." That is due, in most part, to the actions taken by the DCF in the course of the litigation and appeal. In fact, most of the challenged restrictions—either imposed by the County or encompassed in the administrative rule—no longer exist. We agree that appeals "should be dismissed" as moot only "if all issues on appeal are moot[.]" ***Portage County v. J.W.K.***, 2019 WI 54, ¶12, 386 Wis. 2d 672, 927 N.W.2d 509. That is not the case here—even the DCF concedes that this appeal is not entirely moot and that there is (at least) one remaining controversy to be resolved by this court. The Laffertys assert that almost all of their issues still require resolution, while the DCF asserts that only the issue of whether its rule may require that firearms be unloaded while they are stored remains unresolved.

¶53     The Laffertys also assert that the doctrine of "voluntary cessation" creates an exception to mootness in this case. An appellate court may determine that a matter that is moot should still be resolved "when a defendant has voluntarily ceased a challenged practice and it is 'absolutely clear' that the practice can reasonably be expected to recur." ***Blazel***, 407 Wis. 2d 472, ¶49

(quoting ***Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Hum. Res.***, 532 U.S. 598, 609 (2001)).

¶54 Allowing an appeal to be rendered moot by a voluntary cessation, in certain circumstances, has the potential to allow for unchecked mischief. A defendant could stop the complained-of action so as to obtain a dismissal of a lawsuit, only to be able to resume it once the spotlight no longer shines upon the conduct. If all voluntary cessations required dismissals, "'the [appellate] courts would be compelled to leave [t]he defendant ... free to return to [its] old ways.'" ***Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.***, 528 U.S. 167, 189 (2000) (quoting ***City of Mesquite v. Aladdin's Castle, Inc.***, 455 U.S. 283, 289 n.10 (1982) (second alteration and omission in original; citation omitted). "Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power." ***Aladdin's Castle***, 455 U.S. at 289. When considering the abandonment or voluntary cessation, "[t]he 'heavy burden of persua[sion]'" where a party has ceased the complained of action "lies with the party asserting mootness." ***Friends of the Earth, Inc.***, 528 U.S. at 189 (quoting ***United States v. Concentrated Phosphate Exp. Ass'n***, 393 U.S. 199, 203 (1968)). That party is the DCF.

¶55 Here, the Laffertys contend that the County could simply start using the County Form again and infringe on their conceal carry rights. That argument fails because the County Form was not just based on a prior administrative rule, it was based on a rule that not only was revised in 2016 but has since been repealed effective December 1, 2025. Additionally, any guidance provided to the County by the DCF on conceal carry rights has been retracted by the DCF.

26

¶56    For the County to resurrect the County Form, too many hypothetical and speculative actions would have to take place.  Just as "[w]e cannot uphold a judgment based on 'conjecture, unproved assumptions, or mere possibilities[,]'" *Grand View Windows, Inc. v. Brandt*, 2013 WI App 95, ¶22, 349 Wis. 2d 759, 837 N.W.2d 611 (citation omitted), the "heavy" burden of proving that a party is gaslighting the appellate court and intends to resume its nefarious ways must be shown with more than hypotheticals, suspicions, or mere speculation of bad intent. *See, e.g.*, *Hernke v. Northern Ins. Co. of N.Y.*, 20 Wis. 2d 352, 360, 122 N.W.2d 395 (1963) ("The burden of proof as to injuries is upon the plaintiff, and his medical testimony in meeting such burden cannot be based on mere possibilities."); *Helland v. Kurtis A. Froedtert Mem'l Lutheran Hosp.*, 229 Wis. 2d 751, 756, 601 N.W.2d 318 (Ct. App. 1999) (explaining that to establish a factual dispute for summary judgment, "[i]t is not enough to rely upon unsubstantiated conclusory remarks, speculation, or testimony which is not based upon personal knowledge."); *State v. Franklin*, 111 Wis. 2d 681, 686, 331 N.W.2d 633 (Ct. App. 1983) (explaining that to meet the burden of proof, "it is not sufficient that [the defendant] show a mere possibility or suspicion that a conflict could arise under hypothetical circumstances").

¶57    The Laffertys are asking this court to conclude that, because the DCF is able to promulgate administrative rules with respect to restrictions for foster home licensures, it will simply repeal the latest rule once this appeal is completed.  And, that after another administrative rule revision, the County will reinstate the original County Form and insist upon its compliance.  Aside from attributing unsubstantiated, calculated, and underhanded intentions to the DCF and the County, the Laffertys' belief is entirely based upon mere possibilities and random speculation.  It is inherently indefensible.  *See United Pub. Workers of*

*Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947) (explaining that courts are vested with the power to decide only the "actual case[]" before us, "not abstractions").

¶58     We agree that voluntary actions alone during litigation (or an appeal) do not automatically render a case moot. *See Midwest Env't. Advocs., Inc. v. Prehn*, 2025 WI App 55, ¶4, 418 Wis. 2d 212, 26 N.W.3d 347. There must be more. That, however, is not the case here. We further note that legislatures and executive agencies that are able to issue rules are always in a position to issue new rules. That fact alone does not compel a conclusion that it is absolutely clear that a previous rule can reasonably be expected to be reenacted. If that were the case, every rule change, every statute change, and every legislative guidance change would always be subject to uncertainty and litigation would never become moot. That leads to complete confusion. We decline to join the Laffertys' speculative parade of horribles.

¶59     Even so, we conclude that despite the changes to the administrative rule and the County's practices, there are still some issues to be resolved in this appeal. We address those issues and explain why the other issues have, in fact, been rendered moot.

## II. The Laffertys did not waive their rights.

¶60     Before we proceed further, it is necessary to consider whether the Laffertys have waived any or all remaining issues by their voluntary decision to become foster parents. There is no question that constitutional rights may be waived in certain circumstances. *D.H. Overmeyer Co. of Ohio v. Frick Co.*, 405 U.S. 174, 185 (1972); *Waukesha County v. S.L.L.*, 2019 WI 66, ¶34, 387 Wis. 2d 333, 929 N.W.2d 140, *overruled on other grounds by*, *Waukesha County v. M.A.C.*, 2024 WI 30, 412 Wis. 2d 462, 8 N.W.3d 365. An individual may waive

their Fourth Amendment right against warrantless searches by consenting to a search of their premises. *United States v. Rahman*, 805 F.3d 822, 831 (7th Cir. 2015). The consensual waiver of other rights is likewise commonplace.[22] "[C]ourts indulge every reasonable presumption against waiver" of core constitutional rights. *Fuentes v. Shevin*, 407 U.S. 67, 94 n.31 (1972) (citation omitted).

¶61 As well, individuals may contract away their rights.[23] The court in *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 223 (4th Cir. 2019), explained that "[i]t is well-settled that a person may choose to waive certain constitutional rights pursuant to a contract with the government." Of course, such a contractual waiver must be "made knowingly and voluntarily[,]" and, "the interest in enforcing the

---

[22] For instance, individuals and parties may waive their constitutional rights to be present at trial, *Illinois v. Allen*, 397 U.S. 337, 342-43 (1970), to a jury trial, *Parsons v. Associated Banc-Corp*, 2017 WI 37, ¶32, 374 Wis. 2d 513, 893 N.W.2d 212, to testify, *State v. Anthony*, 2015 WI 20, ¶56, 361 Wis. 2d 116, 860 N.W.2d 10, to counsel, *State v. Cummings*, 199 Wis. 2d 721, 756, 546 N.W.2d 406 (1996), and more.

[23] In Judge Neubauer's Concurrence/Dissent at ¶153, she cites to *Roman v. State*, 571 S.W.3d 317, 319 (Tex. App. 2018), which addressed community supervision conditions for a defendant who, "[a]fter pursuing his girlfriend with a gun, … was charged with aggravated assault of a family member[.]" That felony charge was reduced to a misdemeanor. *Id.* It is well established that the Second Amendment right is subject to limitations for defendants while incarcerated or on extended supervision. *See* WIS. STAT. § 941.29(1m); *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]"); *State v. Roundtree*, 2021 WI 1, ¶30, 395 Wis. 2d 94, 952 N.W.2d 765 (referencing the "*Heller* court's statement that felon dispossession statutes are 'presumptively lawful'" (citation omitted)).

Aside from being unrelated to the issue at hand, this is an out-of-state opinion that carries no persuasive or precedential weight on this court. *See Stelling by Ryberg v. Middlesex Ins. Co.*, 2023 WI App 10, ¶62, 406 Wis. 2d 197, 986 N.W.2d 354 (stating that appellate courts "are not bound by non-Wisconsin case law"); *Enpro Assessment Corp. v. Enpro Plus, Inc.*, 171 Wis. 2d 542, 547, 492 N.W.2d 325 (Ct. App. 1992) (stating that cases from other jurisdictions are not binding authority in Wisconsin).

waiver" must outweigh any harm to the public.[24]  *Id.*  Courts are not required to reach the knowing and voluntary questions if "the contractual language relied upon does not, on its face, even amount to a waiver."  *Fuentes*, 407 U.S. at 95.

¶62  The relevant documents here regarding the foster home license application were provided to the Laffertys on a take-it-or-leave-it basis.  There was no negotiation of terms.  The bargaining power tilted in favor of the DCF, which is a sophisticated, government agency.  And, there was no testimony or evidence to establish that the Laffertys knew and agreed to waive their Second Amendment rights.  To the contrary, all of the Laffertys' statements and actions established that they were signing the application under protest so they could continue to serve the community and foster children as foster parents while still maintaining their Second Amendment rights.

¶63  Wisconsin law defines waiver as the "voluntary and intentional relinquishment of a known right[,]" and "intent to relinquish [the right] is an essential element of waiver."  *Milas v. Labor Ass'n of Wis.*, 214 Wis. 2d 1, ¶13, 571 N.W.2d 656 (1997) (second alteration in original; quoting *Von Uhl v. Trempealeau Cnty. Mut. Ins. Co.*, 33 Wis. 2d 32, 37, 146 N.W.2d 516 (1966)).

¶64  "Under ordinary litigation principles, a waiver of a right requires some affirmative signal of 'abandonment.'"  *Hunter v. United States*, 608 U.S. __, 146 S. Ct. 1702, 1710 (2026) (citation omitted).  In other words, "[s]taying

---

[24] In the discussion about searches of group child-care homes, the Neubauer Concurrence/Dissent, at ¶¶163-64, relies heavily upon *Hall v. Sweet*, 666 F. App'x 469 (6th Cir. 2016), but that is a nonbinding, unpublished federal district court case that has no precedential value for this court.  *See, e.g.*, *Lomax v. Fiedler*, 204 Wis. 2d 196, 217, 554 N.W.2d 841 (Ct. App. 1996) (explaining that federal district and appellate court decisions are not binding on state courts).

silent—as [in *Hunter*], not picking a fight—does not qualify." *Id.* This is precisely what did not happen with the Laffertys: they did not stay silent—they protested the infringement on their Second Amendment constitutional rights—and they signed the foster home application under protest. That does not come close to an affirmative signal that the Laffertys abandoned their rights. What more could the Laffertys do when they were presented with only three options: "close out [their] license, renew [their] license and abide by the rule, or renew [their] license and abide by the rule and continue to work with [their] attorney to have it changed at the State level." The Laffertys chose to renew the license and abide by the rule as they worked to change it—that is not in any way a signal of abandonment. The signatures under protest were "picking a fight," which the United States Supreme Court in *Hunter* says is contrary to a waiver. *See id.* "It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States*, 116 U.S. 616, 635 (1886).

¶65 Accordingly, a party's compliance with a legal requirement does not necessarily establish that the party intentionally relinquished the right to challenge the requirement. *See Lingott v. Bihlmire*, 38 Wis. 2d 114, 123, 156 N.W.2d 439 (1968) (holding that a party did not waive her right to appeal by paying money into court under protest where the payment was necessary to prevent the further interest from accruing and she manifested her dissatisfaction with the court's ruling); *Lathrop v. Donohue*, 367 U.S. 820 (1961) (addressing a constitutional challenge brought by a Wisconsin attorney who paid mandatory State Bar dues under protest).[25]

---

[25] Thus, we disagree with the Neubauer Concurrence/Dissent, at ¶166, which asserts that signing, even under protest, waives constitutional rights.

¶66 Finally, rights may be waived or surrendered, in some circumstances, by accepting "reasonable" conditions placed on government benefits. *Burgess v. Lowery*, 201 F.3d 942, 947 (7th Cir. 2000). The condition, however, must be "rationally related to the benefit conferred." *Parks v. Watson*, 716 F.2d 646, 652 (9th Cir. 1983). To determine whether an adequate connection exists between the benefit and the condition (that waives a constitutional right), "the government interest and the justification for the imposed condition must be taken into account, as well as the nature of the required sacrifice." *Cesar v. Achim*, 542 F. Supp. 2d 897, 901 (E.D. Wis. 2008).

¶67 The DCF asserts that "[t]he Laffertys waived whatever constitutional right they may have had to keep loaded firearms unsecured in their home when they voluntarily sought and obtained a state foster home license." It further asserts that "the [s]torage [r]equirement rationally relates to the legitimate state interest in protecting foster children, for whom the state is ultimately responsible."

¶68 The Laffertys counter and assert that the government may not offer benefits only on the condition that a constitutional right must be waived, even more so when the right bears no relation to the benefit. *See American Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 417 (1950) (Frankfurter, J., concurring) ("Congress may withhold all sorts of facilities for a better life but if it affords them it cannot make them available in an obviously arbitrary way or exact surrender of freedoms unrelated to the purpose of the facilities.").

¶69 There is a long history of our courts being cognizant of this concern and taking due care not to allow the government to overstep and inappropriately withhold rights and privileges. *See, e.g.*, *Lawson v. Housing Auth. of City of Milwaukee*, 270 Wis. 269, 274-75, 70 N.W.2d 605 (1955) ("The holding out of a

privilege to citizens by an agency of government upon condition of non-membership in certain organizations is a more subtle way of encroaching upon constitutionally protected liberties than a direct criminal statute, but it may be equally violative of the constitution."); *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 156 (1946) ("But grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever."); *Frost v. Railroad Comm'n of State of Cal.*, 271 U.S. 583, 593 (1926) (explaining that it would be inappropriate "to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold").

¶70    It is well established that the people do not have a "right" to valuable government benefits, but on the other hand, the government "'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests .... This would allow the government to produce a result which (it) could not command directly.'" *Madison Teachers, Inc. v. Walker*, 2014 WI 99, ¶29, 358 Wis. 2d 1, 851 N.W.2d 337 (citation omitted).  This is known as "[t]he 'unconstitutional conditions' doctrine, [which] limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006) (internal citation omitted).  "[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected [right] even if he has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 59 (2006) (citation omitted).

¶71    "The purpose of the doctrine is to prevent the government from indirectly restricting a constitutional right that it may not otherwise directly

impair." *Madison Teachers*, 358 Wis. 2d 1, ¶29. In *Milewski v Town of Dover*, 2017 WI 79, ¶68, 377 Wis. 2d 38, 899 N.W.2d 303, our supreme court applied this doctrine, declaring the courts "do not countenance penalties on the exercise of constitutional rights." Looking to the United States Supreme Court decision in *Frost*, the court further explained that "[i]f the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all." *Milewski*, 377 Wis. 2d 38, ¶67 (citation omitted). We agree. Simply put, "[i]t is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." *Id.* (alteration in original; citation omitted).

¶72 The circuit court considered four circumstances when it concluded the Laffertys had waived their Second Amendment rights and found each one weighed in favor of waiver.[26] But, the court should have started with a preliminary determination: whether there is even a benefit at issue.[27] Here, the Laffertys were allowed to obtain a foster home license and serve the community as foster parents to children who have been determined by our judicial system to be

---

[26] The circuit court looked to:

> (1) the nature of the constitutional right waived, (2) whether the waiver is rationally related to the benefit received, rather than arbitrary and unrelated, (3) the cost versus the benefit, in other words, the harm to the person waiving the right as compared to the threatened harm avoided by the waiver, and (4) the breadth of the restriction imposed by the waiver.

[27] Here, the circuit court, in both of its orders, did not conduct an analysis as to whether a benefit is present. The court simply proceeded as if that was a fact and did not elaborate further on the point. It merely declared "the benefits are the granting of foster care home licensing and the safety of foster children[,]" "placement of foster children in the Lafferty home" is a "discretionary benefit conferred by the government[,]"and "the discretionary benefit of being entrusted with the care of foster children." (Formatting altered).

in need of care or support.[28]   There is no connection—much less a "rationally related" one—between being foster parents[29] and surrendering rights guaranteed under the Second Amendment.

¶73   The DCF points to ***Town of New Holstein v. Daun***, 191 Wis. 93, 95-96, 209 N.W. 695 (1926), for the proposition that a person accepting the provisions of a workman's compensation law, as well as the benefits it provided, was not able to escape the concomitant burdens of that law by saying it was unconstitutional.  That is hardly applicable here.  The Laffertys have not accepted benefits under a law only to argue the same law is unconstitutional; the Laffertys assert that merely agreeing to serve as a foster parent does not indicate a knowing, voluntary waiver of a portion of their Second Amendment rights.

¶74   It is axiomatic that a voluntary waiver cannot be coerced. *See **Colorado v. Spring***, 479 U.S. 564, 573 (1987).  "The inquiry whether a waiver is coerced 'has two distinct dimensions.'"  ***Id.***, (quoting ***Moran v. Burbine***, 475 U.S. 412, 421 (1986)).  Quoting ***Moran***, 475 U.S. at 421, the ***Spring*** Court, albeit in the context of criminal confessions, lists what we should consider:

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a

---

[28]   The Laffertys, in their appellate brief, "do not dispute that the granting of a foster care license is a benefit to them.  This is ... a self-fulfilling benefit."  That concession does not alter our conclusion that the Laffertys did not waive their constitutional rights.

[29]   "[F]oster care [is] one response [of the State] to those situations where the natural parents are unable to provide the 'positive, nurturing family relationships' and 'normal family life in a permanent home' that offer 'the best opportunity for children to develop and thrive.'" ***Smith v. Organization of Foster Fams. for Equal. & Reform***, 431 U.S. 816, 823 (1977) (citations omitted).  The need for foster parents has not abated in recent years, but has grown; "[t]here is an acute shortage of foster parents ... in the country at large." ***Fulton v. City of Phila., Pa.***, 593 U.S. 522, 549 (2021) (Alito, J., concurring).

full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Spring*, 479 U.S. at 573.

¶75     Here, the Laffertys were not able to make a free and deliberate choice; they faced three options.  And, as we note above, the Laffertys did not intend at any point to abandon their rights.  The Laffertys complied with the restriction because the alternative was losing the opportunity to foster when they did not intend to surrender the constitutional right.  The unconstitutional conditions doctrine would be rendered meaningless if the government could simply defeat it by saying the parties voluntarily chose to accept the benefit if that voluntariness is equivalent to a knowing waiver.  Merely being offered the right to walk away is just not enough.

¶76     While we acknowledge that foster parents do knowingly and voluntarily waive some aspects of their constitutional rights, most especially the right to the privacy of their hearth and home by which they allow the State to determine that the premises are appropriate for the State's wards (the prospective foster children), we do not agree that the circuit court was correct when it determined the Laffertys had waived significant parts of their Second Amendment rights when they agreed to serve the community and State as foster parents.  To the contrary, they signed under protest and "picked a fight."  The waiver of that benefit is not reasonably related to any benefit received.  The harm to the Laffertys, and all foster parents, outweighs the DCF's interest in enforcing an overarching waiver of the Second Amendment right in these circumstances.  Accordingly, we conclude the Laffertys did not waive their Second Amendment

right by becoming foster parents.[30]   Next, we consider each of the issues the Laffertys assert are still viable.

### III. The carry ban is no longer applicable.

¶77   The Laffertys challenged the County Form that contained a ban on conceal carry when foster children were present.  They asserted that it (1) violated the Second Amendment, (2) "was not promulgated as a regulation in accordance with [WIS. STAT.] ch. 227[,]"and (3) violated WIS. STAT. §§ 66.0409(2) (which limits local firearm regulations) and 175.60(2g)(a) (which allows concealed carry).  All of these arguments are now moot.  Either in 2020, or shortly thereafter, the County discontinued use of the County Form.  That occurred even *before* the administrative rule was repealed and revised to expressly allow for conceal carry.

¶78   The new rule states:

> **(2)** LAWS.  A foster parent shall comply with all federal, state, and local laws relating to the possession, transportation, and carry of a dangerous weapon.
>
> ….
>
> **(5)** CARRYING A CONCEALED HANDGUN.   (a) A foster parent may carry a concealed handgun in the presence of a foster child if the foster parent has a license to carry a concealed weapon under [WIS. STAT. §] 175.60 … and carries the handgun using a holster or carry system that ensures that the firearm is in the control of the foster parent at all times.

---

[30] We also note that the Neubauer Concurrence/Dissent, at ¶144, begins with the incorrect statement that we have concluded "that foster parents *cannot* waive the rule that they may keep their firearms together with ammunition, but unloaded." (Emphasis added.)  That misreads our conclusion as we only hold that the Laffertys did not waive their constitutional Second Amendment rights under the facts in this case.

> (b) Notwithstanding the license requirement in par. (a), a foster parent may carry a concealed handgun without a state license in accordance with 18 [U.S.C. §] 926B and 18 [U.S.C. §] 962C and other applicable law.

WIS. ADMIN. CODE § DCF 56.076(2), (5)(a)-(b).

¶79    Despite the new rule and the discontinuance of the County Form, and perhaps in an effort to breathe life into this issue, the Laffertys assert that the County Form was not dependent upon the old administrative rule, so the rule's repeal does not repeal the carry ban set forth in the County Form. They also take issue with (1) the permission to carry arguably being conditioned on having a concealed carry license, (2) the failure to mention or expressly allow open carry, (3) the requirement of a holster, and (4) the lack of permission to carry bladed, electrical, and chemical weapons. None of these arguments have merit.[31]

¶80    First, the County Form quoted an old version of the administrative rule and that has since been repealed. It *was* dependent on that rule—the text of that rule was typed out at the top of the County Form. The County Form has been expressly disavowed by both the County and the DCF. And, the intent to disavow the County Form was memorialized in the text of the new administrative rule.

---

[31] The Laffertys' argument that the County Form was an unpromulgated rule is also without merit. First, because the Laffertys fail to adequately develop this argument, we need not address it. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (stating the court may decline to address arguments that are undeveloped). Even if we did consider it, this issue has clearly been rendered moot by the repeal of the old rule and the rescission of the DCF guidance provided to every Wisconsin county.

The Laffertys never developed an argument with respect to their contention that WIS. STAT. § 175.60(2g)(a) was violated. It was only mentioned in their supplemental reply brief. *See Clean Wis., Inc. v. PSC*, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."); *State v. Hayes*, 2004 WI 80, ¶21, 273 Wis. 2d 1, 681 N.W.2d 203 (explaining that the court may decline to address arguments raised for the first time on appeal).

Local regulations are preempted when they "logically conflict[] with state legislation[,]" a principle that extends to state administrative rules. *DeRosso Landfill Co. v. City of Oak Creek*, 200 Wis. 2d 642, 657, 547 N.W.2d 770 (1996). Under this principle of preemption, the old guidance and the now unused County Form, are in direct conflict with the new rule. As a matter of law, if the DCF guidance and/or the County Form were still viable, they would have to "yield" to the new rule. *See id.* The County Form is now, as the circuit court concluded, obsolete.

¶81 Second, the Laffertys quarrel with the new rule's language because it mentions only concealed carry with a license. They contend that that impedes, or outright bans, a foster parent (with or without a conceal carry license) from openly carrying a firearm. The DCF, first, asserts that any reference to the old rule makes that part of this argument moot. Next, it asserts there is no language in the new rule that prohibits a foster parent from openly carrying a firearm in the presence of their foster children.

¶82 The DCF further notes that the rule also provides an exception from the storage requirement for those times a foster parent is "actively using, transporting, or cleaning a firearm[.]" WIS. ADMIN. CODE § DCF 56.076(3). The DCF contends that the actively using and transporting language is expansive enough to allow for open carry and urges this court, under the canon of constitutional avoidance, which favors reasonable readings of a rule, to accept that interpretation. It suggests we "reasonably adopt a saving construction of [the rule] to avoid a constitutional conflict[.]" *See State v. Hager*, 2018 WI 40, ¶31, 381 Wis. 2d 74, 911 N.W.2d 17. We agree with the DCF's arguments. The language of the rule does not impede open carry rights.

39

¶83    Moreover, the rule itself provides more clarity in support of the DCF.  It clearly provides:

> **(2)** LAWS.  A foster parent shall comply with all federal, state, and local laws relating to the possession, transportation, and carry of a dangerous weapon.

WIS. ADMIN. CODE § DCF 56.076(2).  Thus, the rule indicates that it is not overriding or preempting any federal, state, or local laws regarding transportation of a firearm.  Under any of the DCF's arguments, there is sufficient basis to conclude open carry remains permissible.  There is simply no controversy here between the parties such that the Laffertys' open carry claim remains viable. *See Olson v. Town of Cottage Grove*, 2008 WI 51, ¶29, 309 Wis. 2d 365, 749 N.W.2d 211 (explaining when a controversy is justiciable).

¶84    Next, the Laffertys challenge the requirement that they must carry their firearm in a holster or "carry system" "that ensures that the firearm is in the control of the foster parent at all times."  WIS. ADMIN. CODE § DCF 56.076(5).  This is a new issue based upon the new rule; it does not belong in this appeal.[32]  Moreover, the Laffertys' argument related to this issue is insufficiently developed, so we discuss it no further.[33]

---

[32]  Appellate courts do not consider issues not first raised in the circuit court. *Gibson v. Overnite Transp. Co.*, 2003 WI App 210, ¶9, 267 Wis. 2d 429, 671 N.W.2d 388; *Hayes*, 273 Wis. 2d 1, ¶21.  This argument could *not* have been raised in the court below; it is based on the December 2025 rule.  Even if it *were* properly before this court, the Laffertys would have to establish how, under *Heller* which holds that the Second Amendment right meant to "wear, bear, or carry [Arms] upon the person or in the clothing or in a pocket," *Heller*, 554 U.S. at 584, a holster or controlled carry system that appears to require the carrying of a firearm in a way that ensures the weapon is in that individual's control and does not fall, willy-nilly, into the hands of a passing toddler, is a violation of the Second Amendment.

[33]  *See Clean Wis., Inc.*, 282 Wis. 2d 250, ¶180 n.40.

¶85    Finally, the Laffertys contend that, under the new rule, "[b]lade[], electrical, and chemical weapons are still off limits."  Again, they tie this restriction to the County Form—and we have already concluded that the County Form is no longer valid.  Moreover, it was only in the new administrative rule that these other weapons were included in the expanded definition of "dangerous weapon[.]"  *See* WIS. ADMIN. CODE § DCF 56.076(1).  Those definitions were never within the parties' contemplation when the final amended complaint was filed.  Just as with the holster or carry system complaint, this cannot now form the basis for a new argument.  *See* ***Gibson v. Overnite Transp. Co.***, 2003 WI App 210, ¶9, 267 Wis. 2d 429, 671 N.W.2d 388 ("[W]e will not consider on appeal arguments not made to the [circuit] court.").  And, like the prior argument, the Laffertys do not sufficiently develop this argument.[34]

## IV.  The remaining storage restrictions.

### A.  *The current requirements.*

¶86    At the start of this case, the storage restriction was much more limiting.  It required not only locked storage of the unloaded firearm, but separate locked storage of ammunition.  With those restrictions, there was much more concern that the entire purpose of the Second Amendment was placed in jeopardy.  The DCF rule was stretching towards the firearm prohibition declared unconstitutional in ***Heller*** because it appeared to "render[] any lawful firearm in the home [in]opera[tive] for the purpose of immediate self-defense."  *See* 554 U.S. at 635.  The imposition of the former restrictions—one piled upon the other—had

---

[34]  *See infra* note 33.

the strong potential to infringe on the Laffertys' (and all foster parents') right to keep and bear arms.

¶87    While this appeal was pending, the DCF repealed and revised the majority of those storage restrictions, leaving only the requirement that the firearm must be stored unloaded and locked away in some fashion (be it stored with or separately from the ammunition at the foster parents' option).  The new rule states:

> **(3)** SAFE STORAGE OF FIREARMS.  A foster parent who is not actively using, transporting, or cleaning a firearm, or exercising their right to carry a concealed handgun under sub. (5), **shall store the firearm as provided in par. (a)** *and either par. (b) or (c)* as follows:
>
> (a) Unloaded and locked in an area that is not readily accessible to a foster child.
>
> (b) With one or more of the following secondary safety measures used:
>
> 1. Ammunition is locked in a container separate from the firearm.
>
> 2. Trigger lock is engaged on the firearm.
>
> 3. Cable lock is engaged on the firearm.
>
> (c) In a gun safe made of steel with a secure functioning biometric, electronic, or combination locking mechanism that is designed to store firearms and ammunitions. Ammunition may be locked in the gun safe with the firearm.

WIS. ADMIN. CODE § DCF 56.076(3)(a)-(c) (emphases added).

*B. The locked storage container restriction.*[35]

¶88    There is still some confusion as to what *precisely* is now required to store a firearm in a foster home.  A review of the rule sets out the basic requirements.  First, it must be unloaded.  WIS. ADMIN. CODE § DCF 56.076(3)(a). It must be locked in an area that is not readily accessible to foster children.  *Id.* Then, the foster parent has two options: (1) store ammunition in a separate, locked container *or* store ammunition in the same container as the unloaded firearm but with an engaged trigger lock *or* engaged cable lock on the unloaded firearm, under § DCF 56.076(3)(b); or (2) store both the ammunition and the unloaded firearm in a locked, steel gun safe "with a secure functioning biometric, electronic, or combination locking mechanism," under § DCF 56.076(3)(c).

¶89    The option that would, apparently, lead to the quickest time to retrieve and load the firearm when needed appears to be under WIS. ADMIN. CODE § DCF 56.076(3)(c), which allows for an unloaded firearm and ammunition to be stored together, but in an appropriate gun safe.  Such a gun safe is clearly an area that is not readily accessible to children.  But, that is where the current dispute lies.

¶90    The Laffertys contend that the new rule still requires unloaded firearms and two locks (a cable lock, trigger lock, or safe) *as well* as the locked area away from the foster children.  The DCF disputes the "two-lock" theory.  It asserts that is but one of the two available options, to wit:

> [s]ubsection 3(a) sets the baseline requirement that firearms
> must be stored "[u]nloaded and locked in an area that is not

---

[35] Judge Gundrum joins the majority with respect to all sections except for Section IV, B. Judge Neubauer joins the majority regarding Section IV, B, with the exception of ¶95 n.37, and concurs and dissents as to certain other sections. *See* separate writings.

> readily accessible to a foster child," and the Laffertys can meet that requirement by complying with either subsection 3(b) (which requires two locking systems) or (3)(c) (which requires only a single gun safe.)

(Second alteration in original.)

¶91    In other words, the DCF reads the rule such that the "area that is not readily accessible to a foster child" in WIS. ADMIN. CODE § DCF 56.076(3)(a) is met by the steel gun safe option in § DCF 56.076(3)(c), thus making only one lock necessary.  The DCF further asserts that if this reading of the rule is subject to ambiguity, then, under the constitutional avoidance canon, any ambiguity should be read in its favor.  *See* **Hager**, 381 Wis. 2d 74, ¶31.  Further, the DCF is on record now as stating that it "agrees that the Laffertys may store their firearms and ammunition in a single locked gun safe, even if that safe itself is stored in an unlocked area."  To resolve this dispute, we are required to look to the language of the new rule.

¶92    "[S]tatutory interpretation 'begins with the language of the statute [or administrative rule,]'" and the "language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning."  **Kalal**, 271 Wis. 2d 633, ¶45 (citations omitted).  We interpret a rule's language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes [or rules]; and reasonably, to avoid absurd or unreasonable results."  **Id.**, ¶46.  We apply the same interpretative framework to administrative code provisions, and we review interpretations of the administrative code de novo.  **Envirologix**, 192 Wis. 2d at 291.

¶93    For several reasons, we agree with the DCF that the steel gun safe requirement stated in WIS. ADMIN. CODE § DCF 56.076(3)(c) is subsumed into and fulfills the § DCF 56.076(3)(a) requirement that the firearm be locked in an area that is not readily accessible to a foster child.[36]  First, the actual language of the rule indicates that the requirements in § DCF 56.076(3)(b) are "secondary safety measures[,]" while that phrase is not contained in § DCF 56.076(3)(c). Thus, the rule, on its face, indicates that if the gun safe restriction in § DCF 56.076(3)(c) is selected, it is not a secondary safety measure or one that has to be followed in addition to the restrictions under § DCF 56.076(3)(a).  When read as a whole, the provisions of § DCF 56.076(3)(a) and (3)(c) can be harmonized to reach the reasonable conclusion that only one locked area is required.  Thus, the new provisions address storage issues with respect to the location of the firearm and the ammunition.  It is a stand-alone issue, not one that implicates the general storage requirement in § DCF 56.076(3)(a).

¶94    Second, the gun safe provision does not expressly state that the safe must be kept closed and locked (even though that would be reasonably inferred). The safe, arguably, could be left open in a room that was itself locked and kept

---

[36] Even with the multiple changes in the administrative rule during the course of this appeal, the parties were still bound to their burdens of proof.  Had we determined that there were two locks required—the sole argument the Laffertys argued in their supplemental briefing—the DCF would have been required to set out historical analogues to establish that this part of the rule met the *Bruen-Wolford* test.  *See Bruen*, 597 U.S. 1; *Wolford v. Lopez*, 609 U.S. ___, 146 S. Ct. 79 (2026).  In fact, in its response brief, the DCF set out historical analogues for both the separate storage of the firearm and ammunition restriction and for the general locked requirements.  The Laffertys disputed the analogues solely in connection with the separate storage issue.  They did not refute or otherwise challenge the historical analogues proffered by the DCF with respect to a single locked storage.  The Laffertys thus waived that argument against a single lock.  *See United Co-op v. Frontier FS Co-op*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (concluding a party's failure to address a topic in a reply brief may be taken as a concession). Having been waived by the Laffertys, we need go no further.

inaccessible to foster children.  Thus, WIS. ADMIN. CODE § DCF 56.076(3)(a)'s inaccessible and locked requirement is not truly duplicative or mere surplusage when combined with § DCF 56.076(3)(c).  *See* ***Kalal***, 271 Wis. 2d 633, ¶46.  Finally, if there is any ambiguity as to whether one or two locks are required, we follow the canon of constitutional avoidance and conclude that the single lock interpretation is appropriate under ***Hager***, 381 Wis. 2d 74, ¶31.  Finally, we note the DCF is bound by the legal position they have put forth in this appeal.  *See **State v. Petty***, 201 Wis. 2d 337, 347, 548 N.W.2d 817 (1996) (explaining that the equitable doctrine of judicial estoppel remedies the assertion of inconsistent positions).

¶95    Given these reasons, we conclude that the most reasonable reading of the new rule requires only one locked area, that the steel gun safe restriction is not a secondary safety measure, and that the steel gun safe restriction fulfills the requirement for storage where the firearm is locked and inaccessible to foster children even if the safe is not located in some other locked "area."  And, because the Laffertys have waived their arguments against having only one lock, we need not apply the ***Bruen-Wolford*** test, and we need not consider whether historical

analogues allow for this restriction. That is left for another day, for another lawsuit.[37]

¶96 The Laffertys also implicitly raised the issue of the time it takes to unlock two locked safes/locations and load their firearm when they asserted the new rule would effectively render their firearm inoperable. But, that was under the old rule. Now, the foster parent need only open one locked gun safe and load

---

[37] The Gundrum Concurrence/Dissent believes that *Heller*, 554 U.S. 570, prohibits any law that requires the safe storage of a firearm in a home and does so upon a reading that ignores both the law at issue in that case as well as the United States Supreme Court's actual holding. First, the District of Columbia's law was a complete ban on the possession of handguns and a complete ban on carrying a handgun in the home, and it had rules with respect to the storage of other guns. *Id.* at 574-75. The storage requirement in the District of Columbia law also "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock *at all times*, rendering it inoperable." *Id.* at 628 (emphasis added). The *Heller* Court concluded that the "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense[,]" and that the District of Columbia "must issue [Heller] a license to *carry* [his handgun] *in the home*." *Id.* at 635 (emphases added).

Accordingly, the *Heller* Court did not address a rule similar to the DCF's latest version of its firearm restrictions that allow the Laffertys (and all other foster parents) the ability to carry their firearms in their residences for as long as they wish (provided it is done carefully), thus maintaining firearm operability for immediate self- and family-defense. What is more immediate than having a loaded firearm on your hip? *Heller* required the gunowner to have the ability to carry in their residence and struck a permanent storage requirement. The latest DCF rule allows foster parents to carry in their residence and does not require permanent storage of the firearm. In fact, the Laffertys themselves concede that "[o]ne option would be to have a loaded firearm in a single, locked container (rather than the two separate containers [the DCF] require[s] with the firearm being unloaded)." The actual reading of *Heller*, taken with the fact that the Laffertys waived any objections to a single locked storage requirement, establish that it was not necessary for the Gundrum Concurrence/Dissent to engage at all in the *Bruen-Wolford* analysis. Having properly concluded that we need not do so, we have no comment as to whether that analysis—and its review of historical analogues—is correct. That discussion is left to a future appeal; we do not provide advisory opinions and decline to do so here. *See State v. Grandberry*, 2018 WI 29, ¶31 n.20, 380 Wis. 2d 541, 910 N.W.2d 214 ("We resist the invitation of [appellant] and the amicus to make broad pronouncements based on hypothetical facts."); *see also State v. Steffes*, 2013 WI 53, ¶27, 347 Wis. 2d 683, 832 N.W.2d 101 ("[T]his court does not issue advisory opinions on how a statute could be interpreted to different factual scenarios in future cases. Rather, it is our job to adjudicate the dispute in front of us." (citing *Grotenrath v. Grotenrath*, 215 Wis. 381, 384, 254 N.W. 631 (1934) ("[C]ourts will not ordinarily render advisory opinions where the questions propounded have not arisen and may never arise."))).

the firearm with the ammunition stored next to it in the safe. This falls within one of the "options" the Laffertys asserted they are advocating for: "to have a loaded firearm in a single, locked container (rather than the two separate containers [the DCF] require[s] with the firearm being unloaded)."[38]

¶97 Because the Laffertys' arguments against the storage requirement focus solely on the question of whether one or two locks are required and that issue has been resolved based upon a reasonable reading of the language of the regulation, we need not address the constitutionality of requiring locked storage—even with one lock. The question of whether the firearm must be stored unloaded, however, is a separate question that will be addressed below.

### C. The unloaded firearm restriction is unconstitutional.

¶98 The final argument on firearm storage centers upon the requirement—before and now—that the firearm be stored unloaded. Both the Laffertys and the DCF agree that this issue—this one issue at least—requires our resolution.[39] As explained in our prior order to the circuit court, the United States Supreme Court now instructs courts considering the Second Amendment to look to history to evaluate the scope of permissible regulations. The Supreme Court has made clear that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent

---

[38] The Laffertys, in their briefs to this court, consistently took issue only with "the unloaded and separate storage requirements."

[39] The Laffertys have asserted that *none* of their issues have been rendered moot. As explained above, we disagree.

with the Nation's historical tradition of firearm regulation." ***Bruen***, 597 U.S. at 24; *see also* ***McDonald***, 561 U.S. at 767-68.

¶99    The United States Supreme Court in ***Wolford***, the most recent in its series of Second Amendment opinions spanning almost two decades, reiterates "the Amendment's 'central' concern: securing the fundamental right of self-defense." ***Wolford***, 146 S. Ct at 2042.

¶100   There are two steps to the ***Bruen*** Second Amendment test.  "First, a court must determine whether the law before it clashes with the 'plain text' of the Amendment's language."   ***Wolford***, 146 S. Ct at 2043.   "[T]hree subsidiary questions" must be answered in this step: (1) "does the law apply to 'the people'—which is to say, to 'all members of the political community?'"; (2) "does it concern any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes?"; and (3) "does the law place any restrictions on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms?"   ***Id.*** (alterations in original; citations omitted).  The DCF does not contest that this first step has been met in this appeal.  "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional[.]"  ***Id.***  This "means that it *may* violate the preexisting right that the Amendment codified."  ***Id.***  We thus move to the second step in the framework.

¶101   The second step requires the government—here the DCF—to establish that the challenged administrative code does "not infringe the historical understanding of the codified right."  ***Id.***  Under the ***Bruen*** constitutional text and history analysis, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'"  ***Rahimi***, 602 U.S. at 691 (quoting ***Bruen***, 597 U.S. at 24).

¶102 "A variety of sources, including scholarship, may aid this inquiry." *Wolford*, 146 S. Ct at 2044. The United States Supreme Court notes that "the best evidence" when undertaking the *Bruen* framework is "historical analogues." *Wolford*, 146 S. Ct at 2044. "These are old legal rules from which [we] may draw a strong inference that the modern [administrative code] at issue is consistent with the codified right." *Id.* The *Wolford* Court further explains that there are "three important inquiries that courts should undertake in evaluating proffered analogues." *Id.* To wit:

> [t]he first is the number of jurisdictions in which they were adopted. ("[W]e will not stake our interpretation ... upon a law in effect in a single State, or a single city[.]") The second is the extent to which they were well-accepted. This acceptance may be express, as when judicial decisions explicitly acknowledged the rule's legality. Or the acceptance may be tacit, as when a restriction on the keeping or carrying of arms was "open, widespread, and unchallenged."
>
> The third is whether any analogue or collection of analogues is "relevantly similar" to the modern law. Determining whether this condition is met requires consideration of "how" the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. And a court must also consider "why" the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law.

*Id.* (second alteration in original; internal citations omitted).

¶103 To start, as directed by *Bruen* and *Wolford*, we look to see if the regulation—here, regulating the keeping of a loaded firearm in the home of a foster parent—was in existence at the start of our Nation. It was not. The Laffertys note, aptly, that the foster care system was not in place when the Second

Amendment was enacted. We agree.[40] While that is correct, it does not end our inquiry. The precedents established in the United States Supreme Court's recent Second Amendment cases "were not meant to suggest a law trapped in amber." *Rahimi*, 602 U.S. at 691. The Court in *Heller* explained that, "for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding." *Rahimi*, 602 U.S. at 691 (citing *Heller*, 554 U.S. at 582). "Rather, it 'extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence.'" *Rahimi*, 602 U.S. at 691 (alteration in original; citing *Heller*, 554 U.S. at 582). The *Rahimi* Court elaborated:

> [b]y that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.

602 U.S. at 691-92.[41]

¶104 Accordingly, we must apply an analysis that "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. We "must ascertain whether

---

[40] The foster care system is a relatively modern construct emerging only in the mid-20th century. CATHERINE E. RYMPH, RAISING GOVERNMENT CHILDREN: A HISTORY OF FOSTER CARE AND THE AMERICAN WELFARE STATE, 17, 42 (Univ. of N.C. Press 2017). "By 1967, nearly all states had laws placing responsibility for child protection in government hands." John E.B. Myers, *A Short History of Child Protection in America*, 42 FAM. L.Q. 449, 454 (2008).

[41] This concept has been repeatedly applied by our courts. For instance, the United States Supreme Court, in *Riley v. California*, 573 U.S. 373, 387 (2014), and *Carpenter v. United States*, 585 U.S. 296, 310-11 (2018), applied the Fourth Amendment protections to cell phone data and wireless carrier cell-site records—clearly not devices or data that were in existence or even anywhere in the contemplation of Americans when our Nation was founded.

the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (alteration in original; quoting *Bruen*, 597 U.S. at 29).

¶105   It is not necessary that the challenged rule "precisely match[es] its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 30). "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). The United States Supreme Court recently set forth what we should consider when the regulation is a modern construct:

> [w]hile we have not yet had cause to "exhaustive[ly] survey" the features that may render a modern law "relevantly similar" to historical ones, we have said two play a "'central'" role. Call them the "why" and "how." The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld. Conversely, the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review.

*Hemani*, 146 S. Ct. 1677, 1686 (internal citations omitted).

¶106 The DCF asserts that the unloaded firearm regulation is constitutional because it promotes the general welfare by regulating storage, possession by minors, and sensitive places. We disagree.

¶107   Before we start our analysis, however, it is necessary to note that the DCF relies, almost exclusively, upon Cornell's Expert Report to find constitutionality. There are several bases to question that reliance. To begin,

52

Cornell's resume indicates a preference for gun-control restrictions.[42]  Cornell was also an amicus curiae in the United States Supreme Court ***Heller*** appeal in which his brief asserted "there is ample historical precedent for the type of reasonable gun regulations enacted by the District of Columbia at issue in this case."  Brief for Professional Historians and Law Professors as Amici Curiae Supporting Appellees, ***Heller v. District of Columbia***, (No. 10-7036) (D.C. Cir. Sep. 20, 2010), 2010 WL 5108980, at *1.  That regulation was one of the strictest on record and essentially banned operable firearm possession in a home.  Finally, Cornell's opinions have previously been severely criticized by a federal court.  In ***Miller v.***

---

[42]  Six of his interviews, editorials, essays, or podcasts indicate an anti-gun theme:

(1) Saul Cornell, *Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist*, SLATE (June 24, 2022), https://slate.com/news-and-politics/2022/06/clarence-thomas-gun-decision-bruen-anti-originalist.html (last visited July 6, 2026);

(2) Saul Cornell, Opinion, *Guns, guns everywhere: Last week's subway shooting was horrifying.  If the Supreme Court creates a national right to carry, the future will be worse*, N.Y. DAILY NEWS (Apr. 17, 2022), https://www.nydailynews.com/2022/04/17/guns-guns-everywhere-last-weeks-subway-shooting-was-horrifying-if-the-supreme-court-creates-a-national-right-to-carry-the-future-will-be-worse/ (last visited July 6, 2026);

(3) Saul Cornell, *The Supreme Court's Latest Gun Case Made a Mockery of Originalism*, SLATE (Nov. 10, 2021), https://slate.com/news-and-politics/2021/11/bruen-supreme-court-guns-mockery-originalism.html (last visited July 6, 2026);

(4) Saul Cornell, *As SCOTUS Takes on Gun Laws: Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms*, LAW.COM (Nov. 2, 2021), https://www.law.com/nationallawjournal/2021/11/02/as-scotus-takes-on-gun-laws-neither-british-nor-early-american-history-support-the-nearly-unfettered-right-to-carry-arms/ (last visited July 6, 2026);

(5) Saul Cornell, *Gun Anarchy and the Unfree State: The real history of the Second Amendment*, THE BAFFLER (Oct. 3, 2017), https://thebaffler.com/latest/gun-anarchy-and-the-unfree-state (last visited July 6, 2026); and

(6) Saul Cornell, *Taking a Big Bite Out of the Second Amendment*, Origins: Current Events in Historical Perspective (Jan. 2005), https://origins.osu.edu/history-news/taking-big-bite-out-second-amendment (last visited July 6, 2026).

*Bonta*, 699 F. Supp. 3d 956, 1000-01 (S.D. Cal. 2023), the court concluded that Cornell's "opinions tend to reach out beyond historical facts and over-interpret judicial decisions[,]" that he has an "overly-elevated view of state police power[,]" that he had "mis-describe[d]" a quote from a dissent to be from the majority, that he discounts cases that do not match his views (calling them outliers), and that some of his cites to federal opinions are flat-out incorrect.[43] We thus have concerns about potential bias in his opinions and will weigh them accordingly.

¶108 We next consider the DCF's historical analogue argument. It begins by quoting Cornell's report for support that "police power was flexible and allowed states to 'adapt to changing circumstances' and new dangers by crafting new laws to 'deal with the shifting challenges they faced.'" Cornell cites to *Thurlow v. Massachusetts*, 46 U.S. 504, 592 (1847), *overruled on other grounds by Leisy v. Harden*, 135 U.S. 100 (1890), but, as he did in the California *Miller* appeal, he fails to note that the quotes he cites are from the dissent. *See Miller*, 699 F. Supp. 3d at 1000 n.182. As explained in *Miller*, however, it "makes no

---

[43] For instance, the court in *Miller v. Bonta*, 699 F. Supp. 3d 956, 1000 (S.D. Cal. 2023), notes:

> [t]he State's expert, professor Cornell, has been studying and writing about historic gun laws for decades. His opinions tend to reach out beyond historical facts and over-interpret judicial decisions. One example is his sweeping opinion that at the time of the Fourteenth Amendment Americans were apprehensive about "the proliferation of especially dangerous weapons and the societal harms they caused." In support he cites *McDonald* [*v. City of Chicago*, 561 U.S. 742, 767-68 (2010)]. *McDonald* says no such thing.

(Footnote omitted.)

That questionable reference to *McDonald* was not in the report Cornell filed in *this* appeal.

difference" because in ***Thurlow***—which "is a case about the intersection of state police power to license the sale of alcohol and the federal government's power to regulate interstate commerce[,]" "neither the majority opinion nor the dissent in [that opinion] mentions firearms." ***Miller***, 699 F. Supp. 3d at 1000-01.

¶109 With that caution,[44] we consider the DCF's "[t]hree specific, historical uses of the police power" it deems are relevant to firearm restrictions on foster parents. First, the DCF cites to gunpowder storage. That argument, however, cuts against the DCF. Its argument is that "[s]ome laws permitted people to keep a small amount of [gun]powder outside of the public magazine, such as in one's home, but required that the powder be safely stored." The DCF references four state laws it claims supports the current restriction:

> New York law required [gunpowder had to be separated and stored] in the home "into four stone jugs or tin cannisters, which shall not contain more than seven pounds each." Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 6276. … Rhode Island law required that all gunpowder [not stored in a public place] "shall be kept in a Tin Powder-Flask." 1762 R.I. Pub. Laws 132, An Act of June 1762. … New Hampshire law [allowed] personal possession of [ten pounds of gunpowder]

---

[44] Cornell's reliance on police power and the gunpowder storage rules was also called into question in ***Miller***:

> So, when professor Cornell opines that the very core of the police power was the power to regulate firearms and gunpowder, his opinion is only half right. Gunpowder was regulated because of its fire danger—not its danger for use in a firearm. Possession of firearms, on the other hand, was not regulated at all. The antebellum court decisions upon which professor Cornell rests, do not say what he contends they say. Perhaps he is to be forgiven because he is a historian rather than a member of the bar; *but his opinions are not persuasive and are entitled to no weight.*

699 F. Supp. 3d at 1002 (emphasis added).

"which ten pounds shall be kept in a tin cannister properly secured for that purpose." 1786 N.H. Laws 383-84. … Wisconsin ordinance [provided] gunpowder "shall be kept in a close tin canister or canisters." Kenosha, Wis., Ordinance no. 8 § 5 (1858).

¶110 The DCF also references New York, Pennsylvania, Kentucky, and Massachusetts laws, one of which allowed home searches for illegal powder and the others that regulated where in the house gunpowder could be stored. This focus on gunpowder storage laws is misplaced for various reasons. First, the very laws cited by the DCF actually allow the storage of *some* gunpowder in the early American homes, which means that the tins or cannisters could be kept right next to a firearm. There is also a clear distinction between gunpowder and modern ammunition. During the Founding Era, firearms such as muskets required the user to handle loose black powder as a separate propellant; a military drill manual instructed soldiers to prime the musket's pan, pour a powder charge into the barrel, insert a projectile, and use a ramrod to seat the charge before firing. FRIEDRICH WILHELM VON STEUBEN, *REGULATIONS FOR THE ORDER AND DISCIPLINE OF THE TROOPS OF THE UNITED STATES. PART I*, at 18–20 (Phila., Styner & Cist 1779), https://www.loc.gov/item/05030726. The DCF identifies no restriction on keeping a loaded firearm in the home, although loaded firearms were kept in American homes during the Founding Era. Contemporaneous sources also recognized the hazards of storing gunpowder in quantity, including the risk that fire or lightning could cause catastrophic explosions. *See* Letter from Benjamin Franklin to Richard Dawson (May 29, 1772), https://founders.archives.gov/documents/Franklin/01-19-02-0108. Certainly, the safe storage of such a volatile compound required care and careful planning. Modern ammunition has the gunpowder stored within the metal bullet.

It is not appropriate to compare the storage of gunpowder in 1791 with the storage of a magazine or clip of bullets today.

¶111   Independently fatal to the regulation at issue here, the DCF directs us to nothing that would suggest any of the gunpowder regulations to which it cites were for the purpose of preventing excessively easy firing of a weapon—so it fails to even come close to satisfying the "why" needed for a historical analogue. Indeed, as it acknowledges in its briefing, these historical regulations were instead for the purpose of protecting against accidental fire and explosion, not accidental discharge of a weapon.  Additionally, the DCF fails to satisfy the "how" element under *Heller*, *Bruen*, and *Wolford*.

¶112   Even with the non-analogous gunpowder laws on which it relies, the DCF cites to only very few laws and fails to establish that such gunpowder restrictions were open, widespread, and unchallenged.  Pursuant to *Wolford*, the lack of jurisdictions with such laws and the concomitant lack of general wide-spread acceptance throughout the country weighs against the DCF.  Additionally, the DCF argues that, like the gunpowder storage laws, its unloaded firearm restriction "serves an obvious public safety and accident-prevention purpose: it protects foster children from accessing load[ed] firearms and harming themselves or others."  This argument, however, has no connection to the gunpowder storage laws, and thus, carries little weight here.

¶113   In fact, the main reason for discounting the gunpowder storage law argument is that "[t]hese were *fire* safety regulations—nothing more."  *Miller*, 699 F. Supp. 3d at 992.

> The point of the Boston gunpowder storage statute and others like it was, as it proclaimed, to protect communities from fire and explosion during a time when towns had

> many wood buildings, fire departments were ill-equipped, and gunpowder was susceptible to accidental ignition. These types of fire safety laws are analogous to laws requiring gasoline to be stored in state-approved gas cans and fire sprinklers and fire escapes for city buildings.

*Id.* at 992-93 (footnote omitted). They are not analogous to whether a firearm should be stored unloaded in a foster home.[45]

¶114 Finally, the gunpowder storage law analogue offered by the DCF was previously rejected by both *Miller* and *Heller*, the latter of which explained that:

> [g]unpowder-storage laws ... did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns.

*Heller*, 554 U.S. at 632 (internal citation omitted).

---

[45] The *Miller* court further explained that:

> "Boston in 1782 enacted a unique ordinance, expressly for fire protection." "The ordinance did not prohibit *carrying* loaded firearms within the City of Boston—only leaving them unattended in a building—and ... this law was for the protection of those fighting fires." In fact, one scholar mused, "Strictly speaking, the law did not forbid bringing an unloaded gun into a building, and then loading it when inside. So, occupants of homes or businesses remained free to keep loaded guns." In contrast, the State's expert witness, professor Cornell, opined that the gunpowder storage law prohibited Bostonians from storing a loaded weapon in one's home within the town. However, the statutory text does not support his view.

699 F. Supp. 3d at 992 (footnotes omitted).

¶115 We likewise conclude that the gunpowder-storage laws are not a historical analogue that justifies the DCF's administrative rule requiring firearms to be stored unloaded in a foster home.

¶116 The DCF next asserts that early American regulations restricting minors from accessing firearms or prohibiting students from keeping firearms on college campuses are sufficient historical analogues to justify requiring unloaded firearms in foster homes. To start, in one of the circuit court's findings in its decision and order, it reviewed two of the experts' reports and found as follows:

> experts have indicated that if not properly stored, firearms and ammunition not only pose a risk of harm to all children, but a significantly higher risk of harm to foster children.
>
> The Expert Report of Jónelle Brom indicates foster children "are more likely than other children to act impulsively or engage in self harming behavior than other children."
>
> The Expert Report of Dr. Frederick Rivara indicates "children in foster care have a much higher rate of suicidality than children not in foster care."

(Citations omitted.)

¶117 Only Brom is qualified to opine on foster children and their behaviors. Accordingly, we give no weight to the other findings. Brom, who has first-hand experience in Wisconsin's child welfare and foster care system,[46] further opined that:

> foster children tend to have suffered more psychological and physical trauma than non-foster children. The

---

[46] Brom has more than 20 years in the Wisconsin child welfare system and was president of the National Association of State Foster Care Managers.

> government therefore must ensure that licensed foster parents create a safe and supportive environment for foster children that implements trauma-informed parenting practices.

While sadly interesting and relevant to why the restriction may have been proposed, this does not tilt the scale in favor of the DCF.[47]

¶118   We also consider injury and harm to children.  In Wisconsin, from 1999-2018, of the 508 children who died from firearm injuries, 233 were suicides, 238 were homicides, and 34 were accidental.[48]  But, this does not parse out how many were foster children, much less foster children where a parent owned a firearm and/or had a conceal carry permit.  Nor does it indicate how many of the homicides or accidental deaths were the result of a *child* pulling the trigger.  Thus, it carries little persuasive weight.

¶119   When looking to the "why" and "how" of the administrative rule as instructed by *Hemani* (which drew the comparisons from *Bruen* and *Rahimi*), the DCF also points this court to early American regulations that restricted minors from accessing firearms.

---

[47] Moreover, if the DCF believes this court should view the right to keep a loaded weapon in one's home more restrictively because of, apparently, the more dangerous nature of foster children, we would expect the DCF to refer to some Founding Era laws somewhere that it could claim were historically analogous.  If such laws existed, especially on a widespread basis, we would expect to see reference to at least some laws that prevented the keeping of a loaded weapon in a home where a person with mental illness or a violent criminal record resided.  The DCF has shown us no such laws.

[48] Compare the Wisconsin figures to the number of firearm injuries nationally to children over the last 20 years: 29,543 children under 18 died from firearm injuries; 17,359 were homicides, 9,556 were suicides, 2,082 were accidental, and 546 were undetermined.  All of these statistics were taken from the Rivara Expert Report which referenced the Centers for Disease Control and Prevention's Injury Prevention & Control Data and Statistics accessed, by Rivara, January 23, 2021 (https://webappa.cdc.gov/sasweb/ncipc/mortrate.html).

¶120 Even when we look to the previously identified regulations on guardians together with the post-1800 laws regarding restrictions on minors' possession of firearms,[49] it becomes evident that the DCF has failed to meet its burden. The DCF cites very few laws, and those laws it does cite do not mention foster children, and—most significantly—they do not mention unloaded firearms. As a final note, WIS. STAT. § 948.55, which provides that an adult can be charged with a crime for leaving a loaded firearm within the reach or easy access of a child who obtains it and causes harm, does not assist in concluding the unloaded firearm prohibition is constitutional. To the contrary, it establishes that there are alternate means by which the State and/or the DCF may act to ensure the safety of all children, not just foster children. Moreover, one of the elements in that criminal statute is that the loaded firearm is "within the reach or easy access of a child[.]" Sec. 948.55(2), (3). The administrative rule at issue here already requires that firearms be stored "in an area that is not readily accessible to a foster child." WIS. ADMIN. CODE § DCF 56.076(3)(a).

¶121 The DCF's final argument is that because the State may "regulate, and even *ban*, firearms in sensitive places" pursuant to **Heller** and **Bruen**, it may require unloaded firearms in foster homes. Thus, it asserts that foster homes *are* sensitive places. We determine that such sensitive places are distinct and have been treated differently from private homes. Moreover, foster homes do not easily

---

[49] Cornell notes that, "[a]fter surveying hundreds of laws in the nineteenth century, [political scientist Robert] Spitzer concluded that 'numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s.'" But, Cornell cites to only five such laws; he references Kansas, Louisiana, Maryland, and Nevada laws that banned minors from possessing firearms and similar weapons. *See* 1883 Kan. Sess. Laws 159, § 1; 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2; and 1885 Nev. Stat. 51, § 1.

fit within the parameters of either a college[50] or sensitive place designation. It is not necessary for this court to address whether a foster home is a sensitive place, so we decline to do so.[51]

¶122 The Laffertys also assert that, pursuant to *Heller*, the unloaded requirement impermissibly infringes their Second Amendment right because it renders their firearms not operable and usable for timely defense of hearth and

---

[50] The DCF next tries to analogize its challenged rules with those created by historical era colleges that, according to the DCF, "imposed outright bans on keeping any firearms on campus." The DCF overlooks a critical point, however, that makes abundantly clear why such rules present no historical, or even close, analogues with the rules at issue here. Colleges were regulating firearms on *the colleges' own property*; i.e., it was regulating firearms on *its own* hearth and home, so to speak. The DCF's regulations do not regulate firearms on the *DCF*'s hearth and home, but on those of foster families. That is a very obvious, but critical, difference.

[51] The parties both discuss whether a foster home is considered a sensitive place in the Second Amendment context. *See Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]"); *Bruen*, 597 U.S. at 30 (referencing "*Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'"). This issue has been addressed in other jurisdictions. *See Johnson v. Lyon*, 406 F. Supp. 3d 651, 666-67 (W.D. Mich. 2018) which held:

> [p]ublic areas fall within the "sensitive place" exception because they are important to the function of government or because the "possessing firearms in such places risks harm to great numbers of defenseless people ...."
>
> Foster homes are obviously not such a place. They are *homes*. And considering one's home a "sensitive area" would eviscerate *Heller*'s clarification that "the need for defense of self, family, and property is most acute" in the home. Certainly, a foster home—like any other home—is not a place where "great numbers of defenseless people" are found.

(Citations omitted.)

For purposes of this appeal, however, it is not necessary to resolve that question, so we do not address this issue further. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (explaining that when one issue is dispositive of an appeal, we need not discuss others).

home.  In response, the DCF points us to Betley's expert report, in which he was asked to opine "on the average time it would take for a foster parent to access a firearm and ammunition secured in their home in compliance with [the former rule] and prepare the firearm for home defense purposes."  Betley concluded it would take an average user between three and four seconds to combine an unloaded pistol with an adjacent magazine (preloaded with ammunition) and prepare the pistol for firing.

¶123  Betley conceded, as he must, that his statistical information was "gathered using volunteers that performed the assigned tasks under ideal, low stress conditions."  He further conceded that "the type of incidents that would cause an individual to fear for their safety or the safety of others to the extent that they feel the need to arm themselves are rapidly evolving and tumultuous" and that "[t]he commodity of time in these situations is certainly valuable."  In other words, when someone, in the middle of the night, had just been awoken by the sinister, slinky sounds of an intruder, his or her time to load his or her firearm would necessarily increase.  However interesting this temporal argument may be, it, too, carries little persuasive weight, is not tied to any historical analogue, and we do not consider it further.

¶124  In the end, it is the DCF's burden to present historical analogues to justify its administrative rule.  It presented its expert, Cornell, but other than placing all of his eggs in the gunpowder basket, he fails to persuade this court.  Cornell does discuss the increase in laws and regulations regarding the use of firearms by or sale of firearms to minors, but that does not implicate the true issue at hand in this appeal: the safety requirements permissible in a home with foster

children.[52]   In his deposition, Cornell was asked for the best Founding Era analogue to a ban on storing loaded firearms in foster homes, and the best Reconstruction Era analogue to a ban on storing loaded firearms in foster homes. He was not able to identify a single analogue.  That speaks volumes.

¶125   Based upon the foregoing, we conclude that the DCF has failed to present a "historical analogue in purpose and operation," *see **Hemani***, 146 S. Ct. at 1686—the "why" and "how"—related to the regulation of firearms in foster homes.  Accordingly, the current administrative rule's restriction that firearms must be stored unloaded in a foster home is unconstitutional and must be struck from the administrative rule.  *See **State v. Hezzie R.***, 219 Wis. 2d 848, 863, 580 N.W.2d 660 (1998) ("[A] court may find only a portion of a particular [provision] unconstitutional, allowing the remaining valid portions of that [administrative rule] to continue in effect.").

## V. The circuit court erroneously denied the motion for a protective order regarding firearm ownership.[53]

¶126   In the midst of the civil litigation, over their objections, the Laffertys were court-ordered to respond to a discovery request that sought certain

---

[52] In fact, Cornell does not address or have knowledge pertaining to the true issue at hand: foster care and firearm regulations.  In his deposition, Cornell concedes his lack of specialized knowledge of foster care and laws regarding foster children.  For example, while Cornell asserts that foster care did not exist during the Founding Era, he does not know when foster care was developed in the United States, or even which state first started a foster care program.  He likewise does not know when foster care became widespread.

[53] In *Herbal Aspect LLC v. Gish*, 2026 WI App 25, ¶50, 420 Wis. 2d 482, 35 N.W.3d 281, we explained that "under WIS. STAT. RULE 809.10(4), '[a]n appeal from a ... final order brings before the court all prior nonfinal ... orders and rulings adverse to the appellant and favorable to the respondent made in the action or proceeding not previously appealed and ruled upon.'"  In this appeal, that includes the circuit court order denying the Laffertys' motion for a protective order.

information regarding their firearm ownership history that the DCF purportedly sought to assess the Laffertys' standing. That request sought:

> "[f]or every firearm You have owned since You were first licensed as a foster home, state the make and model, caliber, year purchased, and whether you still own that firearm."

¶127 The Laffertys' objection to the interrogatory on the grounds that "it exceeds the scope of discovery, it serves only to harass and annoy, it seeks information that is not relevant to the case, and it is disproportionate to the case[,]" was disregarded by the circuit court and their motion for protective order was denied. The Laffertys responded to the interrogatory and provided the requested information. They appeal that order and ask us to reverse the denial of their protective order and, in addition, seek an order requiring that the DCF and County destroy the records the Laffertys provided. Clearly, this issue is not moot; nothing in the recent rule change impacts the production and retention of this information by the DCF or the County.

¶128 Moreover, the DCF's other argument that "some firearms are so dangerous and unusual that their possession is not protected by the Second Amendment[,]" was not relied upon by the circuit court in its denial of the protective order motion. That court considered the discovery request solely with respect to (1) whether the Laffertys "truly" had standing and (2) "the clear relevancy of determining what lawful, or unlawful, firearms the Laffertys possess[,]" That second point is *not* relevant to the underlying case. The circuit court never explained why the past possession of a firearm is relevant, nor why the possession of any "unlawful" firearms bears on a challenge to the DCF's rule.

¶129 We agree that "[c]ircuit courts have broad discretion in determining whether to limit discovery through a protective order." *Paige K.B. ex rel. Peterson v. Steven G.B.*, 226 Wis. 2d 210, ¶38, 594 N.W.2d 370 (1999); *see also State v. Beloit Concrete Stone Co.*, 103 Wis. 2d 506, 511, 309 N.W.2d 28 (Ct. App. 1981). When considering a decision on a motion for a protective order, "we review the circuit court's decision to determine whether it erroneously exercised its discretion." *Paige K.B.*, 226 Wis. 2d 210, ¶38. In our review, as with all such reviews, "[a] circuit court properly exercises its discretion if it examines the relevant facts, applies the proper standard of law and, using a rational[] process, reaches a conclusion that a reasonable judge could reach." *Id.*; *see also Loy v. Bunderson*, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982).

¶130 Despite the Laffertys clearly addressing this issue in both their initial briefs and their supplemental brief, the DCF makes no response whatsoever in their supplemental response brief. It is a well-established rule that an appellant's arguments not refuted by the respondent are deemed conceded. *See Shadley v. Lloyds of London*, 2009 WI App 165, ¶26, 322 Wis. 2d 189, 766 N.W.2d 838 ("Arguments not rebutted on appeal are deemed conceded."); *Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) ("Respondents on appeal cannot complain if propositions of appellants are taken as confessed which they do not undertake to refute." (citation omitted)). We could conclude our discussion on this issue on that ground alone and simply reverse the circuit court. Even with that concession, however, we conclude that the interrogatory was *indeed* excessive.

¶131 To start, even with the contention that standing was at issue, there was no need whatsoever to obtain over-inclusive firearm information for firearms owned at the start of the Laffertys' foster parent service. How would standing for

a 2020 alleged injury be accomplished based upon a firearm bought in 2016 which could have been immediately sold in 2017? Likewise, how does the year of purchase of a firearm add anything to the Laffertys' standing to bring this lawsuit? It does not. Finally, how does the make, model, and caliber of the firearm impact the Laffertys' standing? Again, it does not. There is no question that the circuit court erroneously exercised its discretion by not, at the very least, narrowing the interrogatory or, more to the point, granting the protective order. That would have satisfied the DCF's discovery to arguably assess standing while still preserving the Laffertys' privacy rights. In fact, all the Laffertys had to do to establish standing was aver, under oath, or submit an affidavit declaring, they had at least one firearm in their home. This is something that Brian Lafferty did in his deposition, and is stated as a fact starting in the Second Amended Complaint.

¶132 Contrary to the Neubauer Concurrence/Dissent, at ¶194, it was not harmless error for the circuit court to deny the motion for protective order. The production and retention of the list of firearms is a continuing invasion of the Laffertys' interests. There was no relevance to standing—or otherwise—to require such an overbroad list that even swept in previously owned (and potentially no-longer owned) firearms. Appellate courts have broad authority to direct proceedings on remand and to order such relief that is necessary to effectuate our decisions. *State ex rel. Dep't of Nat. Res. v. Wisconsin Ct. of Appeals, Dist. IV*, 2018 WI 25, ¶43 n.19, 380 Wis. 2d 354, 909 N.W.2d 114 (citation omitted) (stating that "[t]he court of appeals' 'primary function is error correcting'"); *State ex rel. Swan v. Elections Bd.*, 133 Wis. 2d 87, 93, 394 N.W.2d 732 (1986) ("The court of appeals is intended to be a high-volume, error-correcting court, having a close relationship to the circuit courts in respect to the superintending control of the circuit court functions.") Here, we are exercising

that error-correcting, superintending authority. Thus, we remand so as to restore the parties, as nearly as practicable, to the position they would have been in, absent the erroneous denial of the protective order.

¶133 In this case, we conclude that the circuit court did not reach a conclusion that a reasonable judge could reach. It never addressed what useful purpose—even allowing for the expansive rules of discovery—could be achieved with such an overbroad interrogatory. Based upon those facts and the lack of response by the DCF to the Laffertys' arguments as well as its failure to dispute the requested remedy at all, we reverse the circuit court's order denying the motion for a protective order, and we remand with instructions that the court order the destruction of all records provided by the Laffertys in response to Interrogatory Number 6.

## VI. The DCF's conduct towards this court raises concerns.

¶134 As previously explained, there were ever-shifting sands during this appeal—all of them stirred up by the DCF or the County. First, the County specifically advised the Laffertys that, even though their foster home license could and would be renewed, the DCF would not place any foster children in their approved home during the pendency of this case (now on its second appeal). After the Laffertys filed a motion for a temporary injunction to challenge that relatively meaningless foster parent license, the DCF placed one child with the Laffertys, and then the DCF filed a brief in opposition with an affidavit stating that the motion for temporary injunction was then moot. The circuit court agreed and denied the motion on that ground (even though there were other requests for relief not mooted by DCF's actions).

¶135  Next, the DCF changed its requirements and guidance mid-case to attempt to eliminate the conceal carry arguments, and the County stopped requiring the information and restrictions described in the County Form.[54]

¶136  Then, the DCF repealed and revised its administrative rule and did not timely inform this court.  On December 19, 2025, we issued to the parties notice of oral argument to be held, in person, on February 11, 2026.  Despite knowing that it had changed its rules effective December 1, 2025, the DCF did not notify this court for 65 days from that date until it filed a letter on February 4, 2026 apprising this court of the changes in its rule, only a mere 7 days before the set oral argument.[55]  In the interim, we had prepared for oral argument and devoted significant time to arguments that were no longer at issue.[56]  We can only presume that by that late stage of the game, counsel for the Laffertys (which counsel is out-of-state) had made the necessary arrangements to fly to Wisconsin and participate in the argument.

---

[54] We also note that the Laffertys assert that the summary judgment order was inappropriate, not only on the merits, but because there were material facts in dispute.  In particular, they point to the County's affidavit that averred the County Form was no longer required as of September 2020, but there is a January 2021 Interrogatory Response that says prospective and renewing foster parents were still required to sign and comply with the Form (that bans conceal carry).  And, the Laffertys assert they had to sign the County Form in 2022.  The DCF disputes these points.  The circuit court, in its September 2021 decision and order, found the "obsolete" Form had been withdrawn.  Even assuming, arguendo, that the County Form was required as late as 2020, it is no longer in effect and is directly contrary to the new DCF administrative rule.  Thus, the question of disputed facts is now moot and will not be addressed further.

[55] The DCF altered its rule in a manner that significantly altered the issues left for appeal—so much so that we ordered supplemental briefing.

[56] The issues in this appeal were sufficiently complex and complicated that we ordered oral argument.  We take such arguments seriously and fully and carefully prepare—the majority of that preparation was complete well in advance of the week before argument.

¶137 Thus, in a significantly belated fashion—after we were set for oral argument, and it was mere days away—the DCF's counsel wrote to advise this court that the DCF had revised its rule *months before* and that the oral argument was not necessary as the entire matter may be moot. Even in their supplemental briefing, the DCF did not explain why it had delayed *so long* in providing us notice of the changed rule.

¶138 These efforts to not only move the goal-posts, but to repeatedly do so in the middle and at the very end of the game, are problematic. The DCF's unexplained 65-day delay and 7-day notice raise serious concerns and may warrant sanctions.[57] But, because there is no current motion pending before this court seeking some form of relief by the Laffertys, we do not decide such an issue at this time.

---

[57] An issue not raised or briefed by the parties—and thus not resolved by this court consistent with opinions such as ***Ash Park, LLC v. Alexander & Bishop, Ltd.***, 2010 WI 44, ¶50, 324 Wis. 2d 703, 783 N.W.2d 294 (explaining that the court "'will not consider factual matters raised for the first time on appeal'") and ***Anderson v. Anderson Tooling, Inc.***, 2021 WI App 39, ¶34, 398 Wis. 2d 595, 961 N.W.2d 911 (explaining that the appellate court's review is limited to the facts on the record as they existed at the time of the circuit court's order)—is whether the Laffertys have prevailed on their 42 U.S.C. § 1983 claim so as to permit them to obtain attorney's fees from the DCF and the County. *See also **Doe 1 v. Madison Metro. Sch. Dist.***, 2022 WI 65, ¶35, 403 Wis. 2d 369, 976 N.W.2d 584 (explaining that courts "'do not step out of [their] neutral role to develop or construct arguments for parties[.]'" (citation omitted)). The United States Supreme Court has addressed this question in ***Lackey v. Stinnie***, 604 U.S. 192, 205-06 (2025) (concluding that, where fees were not awarded with respect to a 42 U.S.C. § 1988(b) claim, they could be awarded in the context of a Freedom of Information Act claim if the complainant has "substantially prevailed[]"). This is in contrast with ***Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources***, 532 U.S. 598, 601-02, 610 (2001), in which the Court rejected a "catalyst theory" as a permissible basis for an award of attorney's fees.

Because we remand this matter to the circuit court to address the protective order as noted above, we are confident that if the issue of attorney's fees as a prevailing party is raised, it will be appropriately addressed by that court, which will have the benefit of briefing and argument.

**CONCLUSION**

¶139   The right under the Second Amendment "is an individual 'core' right protected" by our federal Constitution, **Christen**, 396 Wis. 2d 705, ¶25, and state Constitution, **State v. Cole**, 2003 WI 112, ¶20, 264 Wis. 2d 520, 665 N.W.2d 328.   "[T]he right to keep and bear arms is among the 'fundamental rights necessary in our system of ordered liberty.'"   **Rahimi**, 602 U.S. at 690 (quoting **McDonald**, 561 U.S. at 778).   Laws and regulations may not "hobble[] what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives."   **Wolford**, 146 S. Ct. at 2041.   If the Second Amendment right "is to mean anything, it must, as a general matter, permit a person to possess, carry, and sometimes conceal arms to maintain the security of his private residence ..., and to safely move and store weapons within th[o]se premises."   **Hamdan**, 264 Wis. 2d 433, ¶68.   Quoting a historian, the Court in **Rahimi** explained:

> "[d]isarm a community and you rob them of the means of defending life.   Take away their weapons of defense and you take away the inalienable right of defending liberty."

**Rahimi**, 602 U.S. at 690.

¶140   The right is not absolute or unlimited.   **Heller**, 554 U.S. at 626; **Christen**, 396 Wis. 2d 705, ¶25.   Neither, however, is it "a law trapped in amber." **Rahimi**, 602 U.S. at 691.   It "permits more than just those regulations identical to ones that could be found in 1791."   **Id.** at 692.   This is because "the reach of the Second Amendment is not limited only to those arms that were in existence at the founding."   **Id.** at 691.

¶141 In this appeal, the grounds and rules of the game have shifted several times over. Some of the issues—but not all—and parts of the potential infringement of the Laffertys' Second Amendment rights have been rendered moot. Notwithstanding those circumstances, several issues remain to be resolved.

¶142 First, we conclude that the Laffertys did not waive their Second Amendment constitutional right by volunteering to serve the community and help traumatized children by becoming foster parents. We further conclude that the carry ban contained in the Washington County Form is no longer applicable due to the repeal of the old administrative rule, the recission of the DCF's guidance to all counties, and the County's express disavowal of the County Form. Several of the storage requirements are now also moot, in particular, the requirement of storage with at least one lock. Finally, the DCF has failed to meet its burden to justify the requirement that firearms in a foster home must be stored unloaded. We therefore conclude that part of the administrative rule is unconstitutional, reverse that part of the circuit court's final order, and strike that provision from the rule.

¶143 And, because the circuit court erroneously denied the Laffertys' motion for a protective order regarding firearm ownership, we reverse that order and remand to the circuit court with instructions to order the DCF and the County to destroy all of the records the Laffertys provided in response to Interrogatory No. 6.

*By the Court.*—Order reversed and remanded with instructions.

Recommended for publication in the official reports.

No.  2025AP414 (CD)

¶144  NEUBAUER, P.J. (*concurring in part, dissenting in part*). The majority concludes that foster parents cannot waive the rule that they may keep their firearms together with ammunition, but unloaded.[1]  The Laffertys contend that even when foster parents obtain a license to share the state's responsibility to care for and protect foster children, they cannot be required, as a condition, to delay loading their firearm for a few seconds.  It is undisputed that an adjacent preloaded magazine can be combined with a handgun and prepared for firing in three to four seconds.  The limited, narrow, and common-sense condition is directly related to the granting of a foster care license, which imposes many safety requirements on foster parents because of the state's legitimate interest in placing foster children in safe homes.  The rule is reasonable as it seeks to protect our most traumatized and vulnerable children from accessing firearms and injuring themselves and others.  The circuit court did not err in addressing the cross-motions by granting the Respondents' motion for summary judgment, and I would not reverse the judgment.[2]

---

[1] The current safe storage rule is set forth at WIS. ADMIN. CODE § DCF 56.076(3) (Dec. 2025).  I refer to the current rule as the rule, the safe storage rule, or the unloaded firearms rule.  All references to WIS. ADMIN. CODE § DCF 56 are to the December 2025 register unless otherwise noted.

[2] Because the rule at issue is constitutional and enforceable, I need not reach the question of whether, absent a constitutionally valid rule, the Department of Children and Families' (DCF's) unloaded firearms rule violates the Second Amendment rights of foster parents.  Thus, throughout this dissent, I assume without deciding that the Laffertys have such a constitutional right.

¶145 I agree with the majority that the issue presented has narrowed to the question of whether the Laffertys waived their Second Amendment objection to the rule that foster parents may store their firearms together with ammunition, but unloaded. As such, I join the majority at ¶¶52-59, 77-85, 88-96.[3] As to the remainder, I respectfully dissent.

## DISCUSSION

¶146 As I discuss below, the issue presented has narrowed to the question of whether the Laffertys waived their Second Amendment objection to the rule that foster parents may store their firearms together with ammunition, but unloaded. I then address whether the Laffertys knowingly waived their objection to this minimal incremental safety requirement when they willingly chose to seek and obtain a foster care license year after year. As I next discuss, the safe storage delay is reasonable and related to the state's interest in granting licenses to place foster children in homes where they are protected from access to firearms. The sacrifice made—agreeing to store the ammunition outside of the firearm—is minor. The required three to four second delay is not, as the majority suggests, a penalty nor is it an attempt to manipulate foster parents' rights out of existence.

## I. The Issue Before Us is Narrow.

¶147 As the majority properly concludes, the County Form addressing concealed carry rights is no longer applicable and the carry ban is moot. It is entirely speculative that the County would resume using the Form because it was based on a rule that was revised and then repealed, and DCF has retracted any

---

[3] I do not join Majority, ¶95 n.37.

guidance on concealed carry rights it provided to the County. Additionally, the new rule preempts the old rule. I agree with and join the majority at Majority, ¶¶52-59.

¶148 Moreover, the DCF admits that the new rule permits open carry, and any new arguments about the particulars of open carry made for the first time on appeal and not adequately developed are appropriately disregarded. Thus, I also agree with and join the analysis narrowing the issues before us, set forth in the majority at Majority, ¶¶77-85.

¶149 I also agree that the new rule only requires that the "area that is not readily accessible to a foster child" in WIS. ADMIN. CODE § DCF 56.076(3)(a) is met by the gun safe option in § DCF 56.076(3)(c), thus making only one lock necessary. I join the analysis set forth in the majority at Majority, ¶¶88-96.

## II. The Laffertys Waived Their Objection to the Rule Requiring That They Store Firearms Unloaded.

### A. Constitutional rights may be waived by contract.

¶150 Like other constitutional rights, the Second Amendment right can be waived. "Rights may be waived or forfeited—even constitutionally-protected rights." *Waukesha County v. S.L.L.*, 2019 WI 66, ¶34, 387 Wis. 2d 333, 929 N.W.2d 140, *overruled on other grounds by*, *Waukesha County v. M.A.C.*, 2024 WI 30, ¶33, 412 Wis. 2d 462, 8 N.W.3d 365. That principle is not limited to one constitutional context.[4]

---

[4] As the majority also notes, we recognize waiver of First Amendment rights, Fourth Amendment rights, the right to a jury trial, the right to testify, the right to counsel, the privilege against self-incrimination, and due process rights. *See Janus v. American Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 930 (2018); *Parsons v. Associated Banc-Corp.*, 2017

(continued)

¶151 Even assuming that the Laffertys have a Second Amendment right to store firearms loaded, the United States Supreme Court has long held that when individuals voluntarily seek government contracts, "they accept certain restrictions on their freedom as part of the deal." *Fulton v. City of Philadelphia*, 593 U.S. 522, 535 (2021)[5]; *see, e.g.*, *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 223 (4th Cir. 2019); *Medlock v. Trustees of Ind. Univ.*, 738 F.3d 867, 872 (7th Cir. 2013) (contracting parties may consent to warrantless searches); *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213-14 (2013); *see also National Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 138 (2011) ("assum[ing], without deciding that the Constitution protects a privacy right" and holding that the government could nonetheless require contractors to follow certain rules that might otherwise infringe that right).

¶152 Constitutional rights may be waived by accepting conditions attached to a government benefit—here, the foster care license. *See Burgess v. Lowery*, 201 F.3d 942, 947 (7th Cir. 2000); *see also Hall v. Sweet*, 666 Fed. App'x 469, 476–77 (6th Cir. 2016) (no Fourth Amendment violation where a

---

WI 37, ¶32, 374 Wis. 2d 513, 893 N.W.2d 212; *State v. Anthony*, 2015 WI 20, ¶56, 361 Wis. 2d 116, 860 N.W.2d 10; *State v. Cummings*, 199 Wis. 2d 721, 756, 546 N.W.2d 406 (1996); *Salinas v. Texas*, 570 U.S. 178, 190 (2013); *Ness v. Digital Dial Commc'ns, Inc.*, 227 Wis. 2d 592, 602, 596 N.W.2d 365 (1999).

[5] As is evident in my concurring/dissenting opinion in this case, the body of caselaw addressing waiver of constitutional rights when accepting a government benefit pursuant to contract directly follows from United States Supreme Court cases addressing the unconstitutional conditions doctrine. The progeny is extensive and consistent, some of which cases are addressed herein. While federal and other state cases are not controlling, the persuasive value is overwhelmingly and resoundingly clear in setting forth the wholesale adoption and application of the waiver doctrine in the context of an accepted benefit/contract.

home day care operator consented to searches of the home as a condition of a home day care license).

¶153 The Second Amendment is not categorically different for purposes of waiver. The United States Supreme Court has stated that the Second Amendment is subject to the same "'body of rules'" as the "'other Bill of Rights guarantees.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (citation omitted). Government limitations on constitutional rights have been deemed valid conditions upon the receipt of government employment, contracts, and other discretionary benefits. *See, e.g.*, *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008) (government employees); *Board of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996) (government contractors); *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 24 F.4th 640 (7th Cir. 2022) (recipients of discretionary benefits); *Roman v. State*, 571 S.W.3d 317, 322 (Tex. App. 2018) (in a case involving a misdemeanor conviction, the court rejected a Second Amendment challenge to the firearm possession ban for those on community supervision because the ban represented a condition "affirmatively accepted by the defendant as terms of the [community supervision] contract").

¶154 Constitutional waivers are lawful when the condition is reasonable—"rationally related to the benefit conferred." *Parks v. Watson*, 716 F.2d 646, 652 (9th Cir. 1983); *see also Burgess*, 201 F.3d at 947 ("conditions can lawfully be imposed on the receipt of a benefit—conditions that may include the surrender of a constitutional right, such as the right to be free from unreasonable searches and seizures—provided the conditions are reasonable"); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605-06 (2013) (in the land use permitting context, conditions requiring waiver of constitutional rights, such as to just compensation, are valid when they have an "essential nexus and rough

proportionality" to the benefit); ***Dolan v. City of Tigard***, 512 U.S. 374, 394-95 (1994). To determine whether an adequate connection exists between the condition and the benefit, "the government interest and the justification for the imposed condition must be taken into account, as well as the nature of the required sacrifice." ***Cesar v. Achim***, 542 F. Supp. 2d 897, 901 (E.D. Wis. 2008). Summing up the different terminology, a condition on receipt of a benefit is reasonable if it is closely related to the program the state is pursuing and reasonably related to the state's legitimate interest in the program.

### B. A Foster care license is a contract that requires adherence to various safety conditions to protect the children who are in the state's custody and care.

¶155 Foster care is not an ordinary private familial arrangement. It is a state-created and state-regulated relationship grounded in statute, licensure, and contractual obligations. The United States Supreme Court has described the foster family as a relationship that "has its source in state law and contractual arrangements[,]" rather than a relationship arising apart from the power of the state. ***Smith v. Organization of Foster Fams. for Equal. & Reform***, 431 U.S. 816, 845 (1977).

¶156 The DCF is entrusted with the purpose to promote the well-being, safety, and permanence of the state's youth.[6] Under WIS. STAT. ch. 48, known as "[t]he Children's Code," "the best interests of the child … shall always be of paramount consideration," including the "paramount concerns" of the child's "health and safety." WIS. STAT. § 48.01(1)(a). The legislature recognized that the

---

[6] *See generally*, *About DCF,* DEPARTMENT OF CHILDREN AND FAMILIES, https://dcf.wisconsin.gov/about-us (last visited July 24, 2026).

agencies responsible for child welfare may determine that the child be placed outside the home. *Id.* In Wisconsin, children in need of protection or services cases are handled by county child protective services (CPS) agencies.

¶157 The Children's Code provides children's courts with exclusive jurisdiction over children who may be abused or neglected by their parents or caregivers. *See* WIS. STAT. § 48.19. Children can be placed into the DCF's custody and care in several ways, including when a child is without a parent or guardian, has been abandoned, or his or her parent requests assistance. *See* WIS. STAT. § 48.13(1), (2), (4). Alternatively, CPS may take custody if the child is in need of protection or services (CHIPS), including if a child has been, or is at substantial risk of being, the victim of abuse or is subject to various forms of neglect that seriously endangers the health of a child. *See* § 48.13(3), (3m), (8), (9), (10), (10m). CPS may take custody and place the child in out-of-home care, including foster care. WIS. STAT. §§ 48.067(3), 48.205(1), and 48.207(1)(c). After a dispositional stage in a CHIPs proceeding, the circuit court may place the child under the supervision of a licensed child welfare agency, CPS, or in other out-of-home placement, including licensed foster care. WIS. STAT. §§ 48.345, 48.57(1)(h) (providing authority to county foster care departments "[t]o contract with any parent or guardian or other person for the care and maintenance of any child").

¶158 Foster homes and foster parents must be licensed by the DCF. WIS. STAT. § 48.62(1). The Wisconsin legislature has authorized the DCF to create and publish rules relating to the responsibilities expected of licensees. *See* § 48.62; WIS. ADMIN. CODE § DCF 56.01(1) (directing DCF "to establish licensing requirements for foster homes and foster parents directed at protecting the health and safety and promoting the welfare of children placed in the homes"). The safe

storage rule has been promulgated pursuant to this statutory directive. The DCF provides compensation for the foster parents' expenses incurred to care for a foster child. Sec. 48.62(4).

¶159 Thus, foster licenses are a statutory privilege that the state grants only when applicants demonstrate fitness to serve as foster parents and agree to abide by specified duties and obligations. *See*, *e.g.*, WIS. STAT. §§ 48.62(1), 48.67, 48.75(1d). The set of "'mutual promises,'" whereby a foster family "agree[s] to [a foster child's] placement in their home" in return for an agreement "to perform a variety of services in connection with that placement," establishes "a contract." **Wagner v. Dissing**, 141 Wis. 2d 931, 944, 416 N.W.2d 655 (Ct. App. 1987) (citation omitted); *see also* WIS. STAT. § 48.57(1)(h) (providing authority to county foster care departments to "contract with any parent or guardian or other person for the care and maintenance of any child"). The safety measures required in the contractual arrangement set forth the expectations and entitlements of the parties.

¶160 As explained above, when foster parents are provided with a license, the state retains a direct interest in ensuring the safety of those children entrusted to the state's custody and care. Not only is the state required to act in the best interests of foster children, but it also has a constitutional obligation to do so. A foster child has a constitutional right, rooted in the Due Process Clause of the Fourteenth Amendment and arising because he or she has been taken into state custody, to be protected by the state. **K.H. v. Morgan**, 914 F.2d 846, 849 (7th Cir. 1990) (foster child has right to be protected from danger). Correspondingly, the state owes the child in its custody a "duty of safekeeping." **Id.**; *see also* **Lewis v. Anderson**, 308 F.3d 768, 773–74 (7th Cir. 2002) (the state's duty to a foster child arises from the Due Process Clause).

### C. Foster Parents regularly waive constitutional rights by contractually agreeing to the foster care license requirements.

¶161 The mutual promises between foster licensees and the state necessarily result in a waiver of various constitutional rights that those who do not foster would otherwise possess. As a result, "foster parents do not enjoy the same constitutional protections that natural parents do." *Backlund v. Barnhart*, 778 F.2d 1386, 1389 (9th Cir. 1985); *see also* ***Kyees v. County Dep't of Pub. Welfare***, 600 F.2d 693, 698 (7th Cir. 1979) (noting that foster families have more limited liberty interests than natural families or those related by adoption).

¶162 Foster parents regularly choose to waive constitutional rights to foster, rights arguably more intrusive than the unloaded storage requirement. For instance, they waive certain Fourth Amendment rights against searches and are subject to home inspections to ensure the safety of the premises for foster children. *See* WIS. ADMIN. CODE § DCF 56.07(1)(b). Likewise, when a child is placed in a foster home, the foster parent must "enter into a written agreement" that allows child welfare officials "access at all times to the child and the home." WIS. STAT. § 48.64(1m). The DCF can control who may live in a home with a foster family. *See* WIS. ADMIN. CODE § DCF 56.055 (background checks of applicants and co-habitants).

¶163 Thus, waiver by contract is hardly unusual in the foster care agreement. *See **Hall***, 666 F. App'x 469. Illustratively, in ***Hall*** the issue before the court was whether the Fourth Amendment forbids state officials from searching a licensed group childcare home without a warrant. ***Id.*** at 471. The court concluded that it did not, reasoning that the homeowner had expressly agreed on a license application to allow state officials "to make a necessary and reasonable

9

investigation of activities and standards of care, and to make an onsite inspection of my facility and services." *Id.* at 475-76.

¶164 The *Hall* court explained that this was a valid condition of receiving a childcare license, since "the state has an overwhelming justification in ensuring child wellbeing is adequately protected at the locations it licenses for child care." *Id.* at 477. Likewise, "homeowners voluntarily operating a child care business out of their home—knowingly subjecting that home to related regulatory oversight— have a reduced expectation of privacy there." *Id.* Balancing the "overwhelming" state interest in ensuring child well-being against the homeowners' reduced privacy expectations, the court concluded that the condition "was a reasonable one." *Id.*

¶165 In sum, a waiver of constitutional rights is valid if the condition is reasonably related to the benefit (the license to foster children) and to the state's legitimate interest in the licensing program. With these principles in mind, I turn to the instant case.

### a. The Laffertys knowingly waived their constitutional right when they sought and obtained a foster care license year after year.

¶166 The majority suggests the Laffertys did not know they were waiving their rights: "there was no testimony or evidence to establish that the Laffertys knew and agreed to waive their Second Amendment rights." Majority, ¶62. Yet in the very next sentence, the majority emphasizes that "all of the Laffertys' statements and actions established that they were *signing* the application *under protest so they could continue ... as foster parents*[.]" *Id.* (emphasis added). Signing under protest to obtain the benefit of fostering is direct evidence that the Laffertys *knew* they were waiving this right and signed anyway. The record

clearly shows that the Laffertys continued to agree and *to accept* the benefit of fostering children for compensation with the knowledge that the DCF required that guns be stored unloaded year after year. Again, that they did so under protest for the last several years does not detract from the fact that they knew of the rule's safe storage requirement for obtaining a foster care license *and* that they continued to seek and obtain that license.[7]

¶167 The Laffertys filled out their initial foster home license application in March 2016, agreeing to keep all firearms or other dangerous weapons in the home unloaded and locked in an area inaccessible to foster children and further agreeing, as was then required under the relevant administrative code, to keep ammunition materials stored in separate locked areas from the firearms. *See* Majority, ¶¶12-13 n.5; *see also* WIS. ADMIN. CODE § DCF 56.08(5)(a), (b) (Dec. 2015).[8]

¶168 As the majority notes, the application did not require that firearms and ammunition be stored separately, but it did reference the administrative rule which, at that time, did have that requirement. Thus, as part of the licensing contract, the Laffertys agreed to store firearms and ammunition separately. In fact, Brian Lafferty directly and repeatedly testified that the Laffertys were aware of this requirement at the beginning of the licensing process and understood that satisfying that requirement was necessary to receive a foster-care license. He testified that they understood that they were not *entitled* to a foster home license

---

[7] The Laffertys concede that being granted a foster care license is a benefit.

[8] 720 Wis. Admin. Reg. (Dec. 2015) https://docs.legis.wisconsin.gov/code/register/2016/726b/remove/dcf56.pdf (last visited July 28, 2026).

and instead had to agree to comply with the unloaded storage requirement to receive the license. Brian Lafferty further testified:

> [Question:] And when did you first become aware of the storage requirement?
>
> [Lafferty:] The storage requirement we were aware of at the beginning.
>
> [Question:] So you understood that that was a requirement that you had to satisfy in order to receive a foster care license?
>
> [Lafferty:] Yes.

¶169 The Laffertys completed the Child Foster Care Licensing Checklist, which lists *all* the conditions placed upon the receipt of a license, including the unloaded storage requirement, as part of their application and understood that, to move forward, they had to agree to comply with all requirements on that form. The waiver was not implied after the fact. It was part of the licensing process itself.[9]

¶170 The Laffertys have willingly sought to be licensed as foster parents and agreed to be compensated as foster parents year after year, knowing of the safe storage requirement. There is no evidence that the decision to foster children is coercive or that applicants are in any way particularly vulnerable.

---

[9] While the Laffertys agreed to foster pursuant to the prior rule requiring separate storage of ammunition and guns, they waived any objection to the unloaded storage requirement, which has been included in the rules all along.

12

*See Koontz*, 570 U.S. at 605 (conditions are unlikely to be unconstitutional unless they involve benefit recipients who are "especially vulnerable to ... coercion.").[10]

¶171   The majority questions the voluntariness of the Laffertys' agreement to the unloaded storage condition when they did so under protest.  Majority, ¶¶62-65.  It is undisputed that the Laffertys repeatedly sought and agreed to the foster care license knowing of the condition.

¶172   In any event, the "under protest" argument is a red herring because the Laffertys are not seeking to invalidate the prior contractual agreement (the license).[11]  *See Overbey*, 930 F.3d at 223 (court considers whether unconstitutional

---

[10]   The majority's argument that the Laffertys' contractual agreement to accept the foster care license was involuntary because they eventually protested relies in part on voluntary payment cases that are inapt.  Majority, ¶65 (citing *Lingott v. Bihlmire*, 38 Wis. 2d 114, 123, 156 N.W.2d 290 (1968) for the proposition "that a party did not *waive her right to appeal* by paying money into court under protest where the payment was necessary to prevent the further interest from accruing and she manifested her dissatisfaction with the court's ruling").  The voluntary payment doctrine addresses waiver of the right *to bring a lawsuit* to challenge a legal obligation by making a payment.  *See* 66 AM. JUR. 2D *Restitution and Implied Contracts* § 108 (2001) ("The rule is well settled that a person cannot recover money that he or she has voluntarily paid with full knowledge of all of the facts and without fraud, duress, or extortion in some form, and that no action will lie to recover the voluntary payment.")  None of that is at issue here.  The Laffertys did not make any payment.  The Laffertys did not waive their right to bring this lawsuit.  Rather, this case involves the completely different unconstitutional conditions doctrine, which body of caselaw directly addresses waiver of constitutional rights when accepting a government benefit pursuant to contract.

Equally inapplicable is the majority's discussion of *Hunter v. United States*, 608 U.S. __, 146 S. Ct. 1702, 1710 (2026), Majority, ¶64, for the principle that silence is not ordinarily the relinquishment or abandonment of a right.  That the Laffertys have protested for the last several years is not disputed, but it is irrelevant.  While it is not, even if the Laffertys' acceptance of the condition in the foster care contract was involuntary, presumably the DCF would impose the condition again the next day because legally the rule requires foster parents to comply.  The question presented here is whether the DCF can continue requiring that the Laffertys and all other foster parents keep their firearms unloaded.  The majority suggests that absent a knowing waiver, the constitutional conditions doctrine would be "meaningless."  Majority, ¶75.  Not so, the doctrine requires that the condition is reasonably related to the benefit (the license to foster children) and to the state's legitimate interest in the licensing program.

[11]   The Laffertys seek declaratory and injunctive relief.

condition doctrine invalidated party's settlement limiting her First Amendment rights).  The same can be said of many other waiver scenarios, such as of the right to counsel or to a jury trial, where involuntary waivers are deemed invalid.

¶173  Here, it is not a question of whether the Laffertys' prior foster care licenses are invalid because they were involuntary.  The waiver/unconstitutional condition question at issue is whether *anyone* who seeks a foster care license today must agree to the unloaded firearm requirement.

¶174  The majority has not pointed to any waiver/unconstitutional conditions caselaw supporting its "under protest" position.  It is not surprising, because a retroactive analysis of the willingness of a party who has agreed to accept a government contract and has received the benefit is not relevant: the question is whether the condition going forward is permissible or not.  For example, in *Agency for Int'l Dev.*, 570 U.S. 205, the United States Supreme Court did not conduct a voluntariness analysis when determining that a federal statute imposing a policy on aid agencies was an unconstitutional condition.

¶175  Likewise, in *Burgess*, 201 F.3d at 947, the court ruled that a policy requiring strip searches of visitors to prison inmates was unconstitutional because it was not reasonable.  Whether the visitors consented or not was not part of the analysis.  In *National Aeronautics & Space Admin.*, 562 U.S. at 138-39, the supreme court rejected a constitutional challenge by contract employees with long-term access to federal facilities who were required to provide background check information.  The court determined that the information sought was reasonable because it was employment-related and was related to the government's interests in managing its internal operations, and especially in ensuring the security of the facilities.  *Id.* at 150-51.  The court did not apply any sort of voluntariness analysis

to the question. The same can be said of each of the unconstitutional conditions cases cited below in Section II.D, ¶¶185-189. When the issue simply is whether a contractual condition is permissible or not, as is the case here, voluntariness is not relevant.[12]

**b. The unloaded storage requirement is reasonable.**

¶176 The majority's waiver discussion fails to address the *actual* requirement at issue, which permits foster parents to store firearms together with ammunition, but unloaded. WIS. ADMIN. CODE § DCF 56.076(3). Rather, the majority broadly frames the issue as one requiring foster parents to "surrender[] rights guaranteed under the Second Amendment," claiming the rule requires "an overarching waiver of the Second Amendment right" of foster parents. Majority, ¶¶72, 76.

¶177 Again, the condition at issue is extremely limited. It is undisputed that an adjacent preloaded magazine can be combined with a handgun and prepared for firing in three to four seconds. The condition is not a ban on the right to keep arms; it is a requirement imposing a few seconds' delay in loading the foster parents' firearms. And, again, there is neither a constitutional nor a statutory right to have foster children placed in one's home, while the state has a statutory and constitutional obligation to protect foster children.

¶178 The safe storage condition is reasonably related to the granting of a foster care license. The unloaded firearms rule is a condition that directly relates to granting licenses to foster parents who will agree to limit the foster child's

---

[12] Accordingly, the framing of the issue in this case as one of "waiver" is not helpful, but I do so because the parties and the majority use that framework.

access to firearms. It is a valid condition of receiving a license as the state has a strong interest, indeed a compelling justification, given that the state *has custody of, and ultimate responsibility for, the child*, in reducing the risk of firearm-related injury in homes where foster children are placed.

¶179 The majority acknowledges the risk of unsafely stored firearms and in fact duly notes the circuit court's adoption of the experts' reports that improperly stored firearms and ammunition pose a "significantly higher risk of harm to foster children" because they are especially vulnerable. *See* Majority, ¶116.

¶180 In fact, there is no dispute that unsecured firearms pose a serious safety risk to children that is significantly reduced by safe storage practices. The record resoundingly shows the undisputed fact that firearm injuries are a major public health problem for children.[13] Firearm injuries are a leading cause of death among children. According to one of the expert reports, "[o]ver the last 20 years, 29,543 children under 18 died from firearm injuries in the [United States]," of which "9,556 were suicides, 2,082 were accidental," and "17,359 were homicides." In Wisconsin, from 1999-2018, 508 children died from firearm injuries. "Of these, 233 were suicides, 238 were homicides, and 34 were accidental." In short, "firearm injuries represent a major risk to children in the state of Wisconsin." Suicides present a particularly worrying subset of firearms deaths. "Suicide was the second leading cause of death" among children in 2018, with 1,834 fatalities nationwide. Of these, 725 were caused by firearms. And

---

[13] The statistics and information in ¶¶37-39 are generally taken from expert reports in the record. The quotations in ¶37 and ¶39 are attributable to Dr. Frederick P. Rivara, and the quotations in ¶38 are attributable to Jónelle Q. Brom.

according to the United States Centers for Disease Control and Prevention (CDC), 51% of children who died by firearm suicide from 1999-2019 did so in their own home. While one could raise questions as to the applicability of these statistics to foster children, the fact remains that children are at risk, and foster children are especially vulnerable.

¶181   Compared to other children, an overwhelming number of children in foster care—up to 90%—have experienced some form of trauma, including "child abuse and neglect, exposure to domestic violence, [and] community violence," making foster children particularly vulnerable. "[C]hildren who have experienced [such] trauma often exhibit aggression, anger, depression, … impulsivity, … self-harm, and suicidal ideation." Foster children are thus more likely to act impulsively or engage in self-harming behavior—including suicide—than other children.

¶182   It is a fact that safely storing firearms is associated with a significant reduction in the risk of unintentional firearm injury and suicide. David C. Grossman, MD, MPH et al., *Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries*, 293 JAMA 707 (2005), https://jamanetwork.com/journals/jama/fullarticle/200330. "Safe storage practices, including keeping firearms stored unloaded, in a locked place, separate from ammunition" protect unintentional firearm shootings and suicide attempts among adolescents and children. *Id.* The state's expert in the risk of firearms injury and death and the reduction of risk with safe storage indicated he could not emphasize enough the fact that "[a]dolescent suicide risk is strongly associated with firearm availability," and "[s]afe gun storage (guns unloaded and locked, ammunition locked separately) reduces children's risk of injury." That noted, the Laffertys, as foster parents, are not being asked to do this much. The breadth of

the current rule is extremely narrow: the current rule allows ammunition to be locked in the same place next to the unloaded firearms. This is not an unreasonable request on the part of the DCF in the name of reducing the risk of firearm injury and suicide among the vulnerable population of children in foster care.

¶183 Moreover, the unloaded storage requirement—reducing the very real risk that children get their hands on guns and hurt themselves or others—is clearly in the public interest. The minor "sacrifice" of a few seconds delay in accessing a firearm is clearly outweighed by the very real and significant interest in making sure that foster parents protect the children they have agreed to home. There can be no question that the risk associated with foster children's access to unloaded guns every single day and throughout our state cannot be remotely compared with the risk associated with a few second delay in a foster parent's ability to respond to the unlikely event of a home intruder. The government interest clearly justifies the minor sacrifice. *See Cesar*, 542 F. Supp. 2d at 901.

¶184 Unfortunately, the majority largely focuses on the Laffertys' rights, almost as a one-sided equation. But these children have a right to be protected and kept safe from firearms. Because they are children, and in the custody of the state, those rights can only be asserted for them by the state. And, the state has a duty and obligation to protect them and keep them safe. The state's limited and narrow request is eminently reasonable, and it is directly tied to the granting of a license to safe foster homes. The sacrifice asked of voluntary foster parents is nominal.

18

**D. The cases cited by the Laffertys and the majority are not applicable because the unloaded firearm rule is directly tied to the state's interest in protecting foster children.**

¶185   The Laffertys argue that the safe storage rule is an unconstitutional condition.  The unconstitutional conditions doctrine only prevents the government from "requir[ing] a person to give up a constitutional right ... in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the [constitutional right]." *Dolan*, 512 U.S. at 385.  The cases the Laffertys rely on or cite, replicated by the majority, Majority, ¶¶68-71, simply *confirm* that there must be a rational relationship to the benefit conferred. These cases are materially distinguishable because here there *is* a rational relationship between the safe storage requirement and the foster care license provided to the Laffertys.

¶186   In *Lawson v. Housing Authority of City of Milwaukee*, 270 Wis. 269, 70 N.W.2d 605 (1955), the circuit court invalidated a restriction precluding public housing tenants from joining "subversive" groups.  The government could not explain "how the occupation of any units of a federally aided housing project by tenants who may be members of a subversive organization threatens the successful operation of such housing projects." *Id.* at 287.  The condition was not rationally related to the purpose of the public housing benefit conferred by the government.

¶187   Likewise, the cited federal cases simply set forth the black letter law that the condition must be rationally related to the purpose of the benefit conferred.  *See American Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 417 (1950) (Frankfurter, J., concurring) (the government cannot "exact surrender of freedoms unrelated to the purpose of the [benefit at issue]."); *Frost v. Railroad*

*Comm'n of Cal.*, 271 U.S. 583, 591 (1926) (the challenged conditions were "in no real sense" related to the state's interest in public highway use; rather, the state sought to leverage highway access to regulate other aspects of users' business); *see also Stephenson v. Binford*, 287 U.S. 251, 275 (1932) (upholding condition and distinguishing *Frost* where "use of the highways furnished a purely unrelated occasion for imposing the unconstitutional condition"); *Parks*, 716 F.2d at 652 (noting that *Frost* and *Stephenson* rest on the "controlling nature of the absence of a rational relationship between the condition imposed and the benefit conferred").

¶188  In *Milewski v. Town of Dover*, 2017 WI 79, ¶¶63-65, 377 Wis. 2d 38, 899 N.W.2d 303, our supreme court invalidated the government's attempt to "negate one constitutional right by pitting it against another"—taxpayers had to agree to a warrantless search (giving up their Fourth Amendment rights) to preserve their due process right to challenge property tax assessments.  Here, foster parents are not being asked to give up one constitutional right to preserve another, as there is no constitutional right to obtain a foster license.

¶189  In sum, the unloaded firearm requirement is directly tied to the provision of foster care licenses to those who agree to protect and keep foster children safe.

## III. The Majority's Reversal of A Circuit Court Evidentiary Decision That Has Nothing to Do With The Appeal, And The Majority's Requirement That DCF Destroy Documents, Are Both Unprecedented and Factually and Legally Unsupported.

¶190  Unfortunately, I must address the majority's unprecedented and unsupported reversal of the circuit court's evidentiary decision on the scope of discovery, and the majority's order that the DCF destroy documents produced by the Laffertys.  Majority, ¶¶126-33.

¶191 On appeal, the Laffertys contend that the circuit court erred in denying their motion for a protective order seeking to limit the scope of discovery. The Laffertys had asked to be relieved from answering the DCF's interrogatory regarding the details of their firearm ownership. The majority now reverses the court's denial of their discovery objection.

¶192 The majority simply disagrees with the court's decision, incompletely addresses the arguments made before the court, and devises how it would evaluate the discovery dispute within that limited framework. The majority's Monday-Morning quarterbacking is neither factually accurate nor legally supported. Specifically, the majority's rationale is *incomplete* because the DCF also sought the information to explore the degree of burden the rule imposed on the Laffertys. At Brian Lafferty's deposition, he was asked about each of his firearms and the response time required to access and load them. Relevance is broadly defined. The list of firearms was clearly relevant to this case. *See Ranft v. Lyons*, 163 Wis. 2d 282, 290, 471 N.W.2d 254 (Ct. App. 1991) (The scope of discovery is "expansive."). "The criterion of relevancy is whether the evidence sought to be introduced would shed any light on the subject of inquiry." *Nowatske v. Osterloh*, 201 Wis. 2d 497, 505, 549 N.W.2d 256 (Ct. App. 1996). "Any evidence that assists in getting at the truth of the issue is relevant; in other words, any fact which tends to prove a material issue is relevant[.]" *Oseman v. State*, 32 Wis. 2d 523, 526, 145 N.W.2d 766 (1966). This case addresses the Laffertys' challenge to the burden imposed on their rights, and the discovery request was directly aimed at that issue.

¶193 Additionally, the majority requires the DCF to destroy the list of firearms. This extraordinary order raises so many questions. First, the majority cites no legal support for its bald assertion that the court of appeals has

"superintending authority" to order the destruction of discovery documents. Majority, ¶132. The majority states that the DCF's retention of the discovery information is "a continuing invasion of the Laffertys' interests." *Id.* What "interest" is that? Every day litigants produce what they would rather not— information they consider to be private. Laffertys did not request a protective order seeking to seal the information below. The majority fails to explain why this information is now entitled to secrecy. Is the retention of information a litigant did not want to produce in discovery a "continuing invasion" of a party's privacy interests? What counts, and what does not count? I cannot imagine what authority would authorize this court to require that parties destroy discovery documents produced in litigation in a case involving a bread-and-butter evidentiary issue. Where does that "superintending authority" begin and end?

¶194 Lastly, the DCF *did* respond to the Laffertys' request for the destruction of the documents in this appeal, and there was no need to again address the discovery dispute in the supplemental briefing because we did not ask the parties to do so, and the new rule did not implicate that issue. As DCF aptly explained, the discovery dispute is *entirely irrelevant* to the issues presented on appeal. It is obvious that any evidentiary error was harmless. Not all evidentiary errors merit reversal of a judgment or a new trial. *See Westport Ins. Corp. v. Appleton Papers Inc.*, 2010 WI App 86, ¶49, 327 Wis. 2d 120, 787 N.W.2d 894. Wisconsin law permits such relief only if, "after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial." WIS. STAT. § 805.18(2). "For an error to affect the substantial rights of a party, there must be a reasonable possibility that the error contributed to

the outcome of the action or proceeding at issue." *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶28, 246 Wis. 2d 1, 629 N.W.2d 768.

¶195   The Laffertys themselves point out in their reply brief that the State did not cite or rely on the information they provided.   There is no reasonable possibility that unpresented evidence contributed to the result reached on summary judgment.  The Laffertys have failed to demonstrate how the denial of their motion for a protective order had a negative impact upon the judgment against them.  If there was error, it was harmless.

¶196   Yes, we are an error-correcting court, but only within the parameters set forth in the law, including the law relating to the scope of discovery, relevancy, appropriately applying our standard of review applicable to discretionary evidentiary decisions of the circuit courts, and the law related to harmless error.

## IV. The Majority's Gratuitous Discussion Suggesting Sanctions are Appropriate Is Equally Unprecedented.

¶197   Without a motion from the parties or any briefing on the issue, the majority engages in a wholly gratuitous and extensive discussion raising "concerns" about DCF's litigation conduct culminating in a suggestion that the conduct may "warrant[] sanctions."  Majority, ¶¶134-38.  Notably, in the same breath, the majority cites the black letter law that an issue not raised or briefed by the parties should not be considered because in doing so, we would "'step out of [our] neutral role to develop or construct arguments for parties[.]'"  Majority, ¶138 n.57 (quoting *Doe 1 v. Madison Metro. Sch. Dist.*, 2022 WI 65, ¶35, 403 Wis. 2d 369, 976 N.W.2d 584).  Sanctions were not raised or briefed by the parties, and the majority has stepped out of its neutral role to construct an argument.

¶198    The majority first complains about litigation conduct before the circuit court.  However, there was no motion raising these issues before the circuit court, and had there been, notice and an opportunity to respond would have been required.  *See* WIS. STAT. § 802.05(3).  Obviously, then, there is also no order under review in this court regarding the DCF's litigation conduct before the circuit court.  In *Howell v. Denomie*, 2005 WI 81, ¶¶16-19, 282 Wis. 2d 130, 146, 698 N.W.2d 621, our supreme court held that a separate motion also is a strict prerequisite for appellate sanctions when an appeal is frivolous.  The majority's departure from judicial restraint to *sua sponte* raise and pass judgment on the DCF's actions during litigation before the circuit court without any motion, much less input, from the parties or any circuit court decision to review on appeal undermines our court's role as a neutral arbiter.

¶199    The majority goes on to raise "concerns" about a two-month delay in notifying this court of the change in the administrative rule.  We do not know what caused the two-month delay.  How could we without notice and an opportunity for the DCF to address this issue.  The majority suggests that this increased our work.  Did it?  Guided by *Howell*, it follows that if we are going to *sua sponte* raise concerns about a party's litigation conduct and engage in an extensive discussion, that party should have notice and an opportunity to respond.  *See id.*

## CONCLUSION

¶200    The Laffertys waived any constitutional objection to the unloaded firearm rule when they knowingly accepted that requirement as a condition of receiving a foster-home license.  The current rule is limited and extremely narrow.  It is a reasonable restriction on foster caregivers, who agree to act in the children's best interests when they accept shared responsibility for vulnerable and

traumatized children in the state's custody. These foster children have a due process right to have the state act in their best interests. I join the majority at Majority, ¶¶52-59, 77-85, 88-96. As to the remainder, I respectfully dissent.

No.   2025AP414(CD)

¶201   GUNDRUM, J. (*concurring in part; dissenting in part*).  I write separately because while I join in the remainder of the majority's opinion, I cannot embrace the majority's handling of the question of the constitutionality of the Department of Children and Families' (DCF's) locking requirements for firearms maintained by a foster parent.  *See* WIS. ADMIN. CODE § DCF 56.076 (through Dec. 2025).[1]   Specifically, I dissent from paragraphs 88-97 of the majority opinion, Majority, ¶¶88-97, but join in the rest of it.

## DISCUSSION

¶202   To begin, I agree with the Laffertys that the new DCF rule still requires a foster parent to successfully navigate opening two locks and then loading his/her firearm before said parent will be in a position to defend hearth and home—including the foster child—from an intruder.   Like the trigger-lock requirement the United States Supreme Court held unconstitutional in *District of Columbia v. Heller* because it rendered lawful firearms in the home inoperable "for the purpose of immediate self-defense," 554 U.S. 570, 630, 635 (2008), the rule here fails and for the same reason.

¶203   It seems safe to say a strong percentage of intrusions into an occupied home occur under cover of darkness.  *See Jackson v. City and Cnty. of San Francisco*, 576 U.S. 1013, 1014 (2015) (Thomas, J., dissenting from denial of certiorari) ("Department of Justice, Bureau of Justice Statistics, survey estimating that over 60 percent of all robberies of occupied dwellings between 2003 and 2007

---

[1]   All references to WIS. ADMIN. CODE § DCF are to the Dec. 2025 Register.

occurred between 6 p.m. and 6 a.m."). To maintain safety and the element of surprise, a homeowner roused from his/her slumber by the sounds of an intruder would likely want to maintain darkness and quiet so as not to compromise his/her ability to surprise the intruder. Under such circumstances, the foster parent trying to protect the foster child, him/herself, and any other family members in the home, would have to navigate unlocking a room where a firearm is stored, then unlocking a cable lock or trigger lock on a firearm, a safe with the firearm (and ammunition) inside, or a separate container with the ammunition, and *then* loading the firearm, all while maintaining darkness and quiet for effective defense. *See* WIS. ADMIN. CODE § DCF 56.076(3). This will almost certainly require locating a flashlight, moving in a slow, quiet/stealth manner and working through the locks while holding the flashlight or placing it nearby.[2] The new DCF rule is unreasonable and unconstitutional.[3]

---

[2] Any "testing" done to determine how long it would realistically take a homeowner to get to and load a firearm that does not fully account for the actual circumstances a homeowner would face during a home invasion is worthless.

[3] In his dissent from the denial of a petition for certiorari, which dissent Justice Antonin Scalia joined, Justice Clarence Thomas commented on a San Francisco Police Code that provided that

> "[n]o person shall keep a handgun within a residence owned or controlled by that person unless" (1) "the handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice" or (2) "[t]he handgun is carried on the person of an individual over the age of 18 …."

(continued)

*Jackson v. City and Cnty. of San Francisco*, 576 U.S. 1013, 1014 (2015) (Thomas, J., dissenting from denial of certiorari) (alterations in original; citation omitted). The dissent noted that the Court of Appeals for the Ninth Circuit "readily acknowledged that the law 'burdens the core of the Second Amendment right' because '[h]aving to retrieve handguns from locked containers or removing trigger locks makes it more difficult for citizens to use them for the core lawful purpose of self-defense in the home." *Id.* at 1014-15 (alteration in original; citation omitted). The dissent recounted how *Heller* held the trigger-lock law in that case unconstitutional "because a trigger-lock requirement prevented residents from rendering their firearms 'operable for the purpose of immediate self-defense.'" *Id.* at 1015 (citing *District of Columbia v. Heller*, 554 U.S. 570, 629, 635 (2008)). The dissent added:

> San Francisco's law allows residents to *use* their handguns for the purpose of self-defense, but it prohibits them from *keeping* those handguns "operable for the purpose of *immediate* self-defense" when not carried on their person. The law thus burdens their right to self-defense at the times they are most vulnerable— when they are sleeping, bathing, changing clothes, or otherwise indisposed. There is consequently no question that San Francisco's law burdens the core of the Second Amendment right.

*Jackson*, 576 U.S. at 1015.

The dissent also noted the declarations of several petitioners:

> One petitioner, an elderly woman who lives alone, explained that she is currently forced to store her handgun in a lock box and that if an intruder broke into her home at night, she would need to "turn on the light, find [her] glasses, find the key to the lockbox, insert the key in the lock and unlock the box (under the stress of the emergency), and then get [her] gun before being in position to defend [herself]." As she is over 79 years old, that would "not [be] an easy task." Another petitioner stated that she is forced to store her gun in a code-operated safe and, in the event of an emergency, would need to get to that safe, remember her code under stress, and correctly enter it before she could retrieve her gun and be in a position to defend herself. If she erroneously entered the number due to stress, the safe would impose a delay before she could try again. A third petitioner explained that he would face the same challenge and, in the event the battery drains on his battery-operated safe, would need to locate a backup key to access his handgun. In an emergency situation, the delay imposed by this law could prevent San Francisco residents from using their handguns for the lawful purpose of self-defense. And that delay could easily be the difference between life and death.

(continued)

## I. Two Locks Are Required.

¶204  DCF claims that under the new rule two locks are only necessary "for firearms stored in a locked area (like a locked room) under [WIS. ADMIN. CODE § DCF 56.076](3)(b) rather than in a gun safe under subsection (3)(c)." "Subsection (3)(a)," DCF asserts, "sets the baseline requirement that firearms must be stored '[u]nloaded and locked in an area that is not readily accessible to a foster child,' and the Laffertys can meet that requirement by complying with either subsection (3)(b) (which requires two locking systems) or (3)(c) (which requires only a single gun safe)." Essentially, DCF asserts that having a firearm in a gun safe under (3)(c) also satisfies the locked area requirement of (3)(a). The Laffertys, on the other hand, insist the new rule requires a homeowner to store his/her firearm behind two locks—the "locked … area that is not readily accessible to a foster child" under (3)(a) *and either* one of the three locking options under (3)(b) *or* the locking option under (3)(c), a safe. The Laffertys are correct.

¶205  A party's argument in its brief cannot wave away the actual text of a duly enacted administrative rule any more than it could wave away the actual text of a duly enacted statute. Moreover, interpretation of an administrative rule, like interpretation of a statute, is a matter of law, *State ex rel. Peter Ogden Family Trust of 2008 v. Board of Review*, 2019 WI 23, ¶24, 385 Wis. 2d 676, 923 N.W.2d 837, and "we are not bound by a party's concession of law," *State v. Anderson*, 2014 WI 93, ¶19, 357 Wis. 2d 337, 851 N.W.2d 760.

---

*Id.* at 1015-16 (alterations in original; citations omitted).

¶206 The rule at issue states:

(3) SAFE STORAGE OF FIREARMS. A foster parent who is not actively using, transporting, or cleaning a firearm, or exercising their right to carry a concealed handgun under sub. (5), shall store the firearm as provided in par. (a) *and either* par. (b) *or* (c) as follows:

(a) Unloaded and locked in an area that is not readily accessible to a foster child.

(b) With one or more of the following secondary safety measures used:

1. Ammunition is locked in a container separate from the firearm.

2. Trigger lock is engaged on the firearm.

3. Cable lock is engaged on the firearm.

(c) In a gun safe made of steel with a secure functioning biometric, electronic, or combination locking mechanism that is designed to store firearms and ammunitions. Ammunition may be locked in the gun safe with the firearm.

WIS. ADMIN. CODE § DCF 56.076(3)(a)-(c) (emphases added).

¶207 The DCF's position that complying with WIS. ADMIN. CODE § DCF 56.076(3)(c) also satisfies (3)(a) has the mildest of legs because (3)(b) includes the word "secondary," clearly indicating that the (3)(a) "locked in an area" requirement needs to be complied with as well as a *second* lock requirement of (3)(b), either with ammunition locked in a separate container or with a trigger lock or cable lock engaged on the unloaded firearm. Paragraph (3)(c), by contrast, does not include words like a "secondary safety measures." *Id.*

¶208 For two reasons, however, this "secondary safety measures" language fails to persuade that compliance with WIS. ADMIN. CODE § DCF 56.076(3)(c) alone—having the firearm in a gun safe—satisfies the "locked

in an area" requirement of (3)(a). *See* § DCF 56.076(3)(a), (c). To begin, unlike with (3)(b), with (3)(c), there is no list of secondary compliance measures, so a lead-in sentence like "[w]ith one or more of the following secondary safety measures used" simply would not make sense in (3)(c). *See* § DCF 56.076(3)(b). So, it may well be reading in too much to conclude that the absence of "secondary safety measures" language in (3)(c) indicates that complying with (3)(c) alone also satisfies the requirement of (3)(a). *See* § DCF 56.076(3)(a), (c).

¶209 Secondly, there would be no need for the "secondary safety measures" language in WIS. ADMIN. CODE § DCF 56.076(3)(c) because the structure of the rule already provides the (3)(c) secondary-safety-measure language. In writing the "shall store the firearm" language as it did, the rule makers wrote it to require that if the firearm was going to be locked in a safe, under paragraph (c), it still needed to independently satisfy paragraph (a). *See* § DCF 56.076(3)(a), (c). To hold otherwise, would give no meaning to the words "and either" and "or," doing harm to the proper reading of the sentence. *See id.* A foster parent must satisfy paragraph (a) by having the firearm unloaded and "locked in an area that is not readily accessible to a foster child"—"like a locked room," as DCF itself states—"and" also satisfy "either par. (b) or (c)," just as the rule says. *See* § DCF 56.076(3)(a)-(c). DCF acknowledges that in relation to paragraph (b), "an area that is not readily accessible to a foster child" means something "like a locked room." DCF fails to persuade that "an area that is not readily accessible to a foster child" has a different meaning in relation to paragraph (c). If paragraph (c) alone also satisfied paragraph (a), the rule makers would not have written the rule so that it requires *either* paragraph (a) and paragraph (b) *or* paragraph (a) and paragraph (c) to be satisfied in order to meet compliance. But that is how they wrote it.

¶210 So, under DCF's new rule, a foster parent cannot comply with the storage requirement without having to then successfully work through two locks in order to defend his/her home when necessary.

¶211 Though I believe the language of the rule is plain enough, my reading of it is reinforced by consideration of a review of the Wisconsin Administrative Register that detailed and explained the changes to the rule. The register states that the new rule:

> *Maintains the requirement* that a firearm be stored unloaded and locked in an area not readily accessible to a foster child *and* modifies *additional* storage provisions *from* requiring that ammunition be stored in a separate locked area *to instead* requiring that a firearm *either* be stored in a gun safe with ammunition allowed *or* one or more of the following: with ammunition locked in a container separate from the firearm, with the trigger lock engaged on the firearm, or with the cable lock engaged on the firearm.

839B Wis. Admin. Reg. (Nov. 24, 2025) https://docs.legis.wisconsin.gov/code/register/2025/839b/register/final/cr_25_043_rule_text/cr_25_043_rule_text (last visited June 24, 2026) (register emphases omitted; emphases added.).

¶212 By my reading, this register language first indicates that the new rule "[m]aintains the requirement that a firearm be stored unloaded and locked in an area not readily accessible to a foster child." *See id.* This is the FIRST LOCK requirement of WIS. ADMIN. CODE § DCF 56.076(3)(a); the firearm must be "locked in an area that is not readily accessible to a foster child"—a locked bedroom, closet, basement, etc. *Id.* After explaining that the first lock requirement is *maintained*, the register language then also states ("and") that the new rule no longer merely requires that the ammunition "be stored in a separate

locked area," but instead gives options for "*additional* storage provisions." 839B Wis. Admin. Reg. (Nov. 24, 2025) (emphasis added). Rather than requiring that the ammunition be locked up separately from the firearm that is "locked in an area not readily accessible to a foster child," with the new rule, what is "instead requir[ed] [is] that a firearm *either* be stored in a gun safe with ammunition allowed [SECOND LOCK] *or* … with ammunition locked in a container separate from the firearm, with the trigger lock engaged on the firearm, [and/]or[4] with the cable lock engaged on the firearm [three other SECOND LOCK options]." ***Id.*** (register emphases omitted; emphases added); *see* § DCF 56.076(3)(b)-(c). The first "additional" storage provision/requirement/option is storing the firearm "in a gun safe." 839B Wis. Admin. Reg. (Nov. 24, 2025). The new rule just gives more options for "additional" storage requirements than simply locking the ammunition in a container separate from the firearm. ***Id.***

¶213 Thus, I conclude, like the Laffertys, that the new rule still requires a foster parent roused from his/her sleep in the dead of night by sounds of an intruder to navigate unlocking and entering (likely with the aid of a flashlight he/she has located) the "locked … area that is not readily accessible to a foster child," *then* unlocking the gun safe, trigger lock, cable lock, or ammunition container that is inside of that locked area, and *then* loading the firearm to finally,

---

[4] "[and/]or" is in place of "one or more of the following:"

finally be prepared to defend his/her life and the lives of other loved ones in the home.[5]  *See* WIS. ADMIN. CODE § DCF 56.076(3)(a)-(c).

## II. Whether One Lock Or Two Is Required, DCF Fails To Satisfy Its Burden.

¶214  Over the past four years, the United States Supreme Court has pounded home with significant clarity the test that must be met for a government entity's regulation of firearms to survive.  The most recent of these Second Amendment decisions, ***Wolford v. Lopez***, 609 U.S. ___, 146 S. Ct. 2032 (2026), and ***United States v. Hemani***, 609 U.S. ___, 146 S. Ct. 1677 (2026), released just weeks ago, sum up how a government regulation of firearms should be reviewed.

¶215  The ***Wolford*** Court reiterated that the central concern of the Second Amendment is "securing the fundamental right of self-defense."  146 S. Ct. at 2042.  The Court noted that in its earlier ***Heller*** decision, it laid out a "history-based analysis" it found "necessary to prevent judges from balancing away the right that the Second Amendment was adopted to protect," ***id.***, and that in ***New York State Rifle & Pistol Ass'n v. Bruen***, 597 U.S. 1 (2022), it "fleshed out the [two-step] process of historical analysis required in a Second Amendment case."  ***Wolford***, 146 S. Ct. at 2043.  "First, a court must determine whether the law before it clashes with the 'plain text' of the Amendment's language."  ***Id.***  If the law "falls within the plain text of the Second Amendment, it is presumptively

---

[5] In all of DCF's briefing, the firearm is treated exclusively as a tool of harm to the innocent—a tool by which a child (foster or otherwise) could kill or seriously harm, either accidentally or intentionally, him/herself or someone else.  Almost completely lost in all of the discussion is any recognition or consideration of the value of the firearm as a tool of defense—to *protect* the foster child and any other residents of the home from a home invader.  The Framers of the Second Amendment did not lose sight of the defense value of a firearm (indeed, it was front and center in the drafting of the Second Amendment); neither should the courts.

unconstitutional." *Id.* at 2044. Because DCF "does not contest that this first step is satisfied" in this case, it concedes its rule is presumptively unconstitutional. This is wise, as the first step is obviously met because DCF's regulation goes directly to the heart of the Second Amendment, the right of a homeowner to keep and bear a firearm for immediate self-defense in his/her home.

¶216 "To overcome that presumption, the government then bears the burden of showing its regulatory efforts are 'consistent with the Nation's historical tradition of firearm regulation.'" *Hemani*, 146 S. Ct. at 1685 (citation omitted). "[T]he appropriate analysis [on this question] involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1686 (citation omitted). To show this, the government must produce evidence of "historical analogues." *Wolford*, 146 S. Ct. at 2044.

¶217 In evaluating a government entity's proffered historical analogues, courts should first consider "the number of jurisdictions in which they were adopted," because courts should "not stake [their] interpretation … upon a law in effect in a single [s]tate, or a single city." *Id.* (citing *Heller*, 554 U.S. at 632). The *Wolford* Court reiterated this point, emphasizing that "[a]n outlier legal rule adopted in a few locales is not enough." *Wolford*, 146 S. Ct. at 2050. Courts should consider "the extent to which [the supposedly analogous laws] were well-accepted," as shown either expressly, "as when judicial decisions explicitly acknowledged the rule's legality," or tacitly, "as when a restriction on the keeping or carrying of arms was 'open, widespread, and unchallenged.'" *Id.* at 2044.

¶218 The next inquiry a court should make in evaluating whether a government's proffered analogues show that the contested rule is consistent with

the historical understanding of the Second Amendment is whether the analogue or analogues are "'relevantly similar' to the modern law." *Id.* (citation omitted).

> Determining whether this *condition* is met requires consideration of "how" the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. And a court must also consider "why" the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law.

*Id.* (emphasis added; citation omitted). The *Wolford* Court explained that "[p]articularly when the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted, it is too much to demand" that the analogue be a "dead ringer" or "historical *twin*." *Id.*

> But the "how" and "why" of the historical analogue and modern regulation must be close enough to enable a court to say: "Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right."

*Id.*

¶219 The *Wolford* Court considered a Hawaii law that, as the Court stated it, "generally prohibits licensed individuals from carrying a firearm, even if unloaded or inoperable, 'on private property of another," "unless 'express authorization' has been given 'by the owner, lessee, operator, or manager of the property.'" *Id.* at 2046 (citations omitted). The Court first asked if the law fell within the plain text of the Second Amendment and determined that this requirement was "easily met." *Id.* at 2047.

11

¶220 In attempting to satisfy its burden to show its law was consistent with the historical understanding of the Second Amendment, Hawaii presented numerous laws from the colonial era:

- a 1721 Pennsylvania law entitled "An Act to Prevent the Killing of Deer *Out of Season, and Against* Carrying of Guns and Hunting By Persons Not Qualified," which statute "made it unlawful to 'carry any gun or hunt on the improved or inclosed lands of any plantation, other than his own,' without securing 'license or permission from the owner of such lands or plantation.'" *Id.* at 2051 (citation omitted). "The law's stated purpose was to prevent 'divers[e] Abuses, Damages and Inconveniences' that 'ha[d] ar[i]se[n] by Persons carrying Guns, and presuming to hunt on other people's lands.'" *Id.* (alterations in original; citation omitted).

- a 1722 New Jersey statute that, according to the Court, stated "no person shall 'carry any [g]un, or [h]unt on the [i]mproved or [i]nclosed [l]ands in any [p]lantatio[n] … other than his own.'" *Id.* (alterations in original; citation omitted).

- a 1728 Maryland statute titled "An Act to Encourage the Destroying of Wolves, Crows, and Squirrels," which "made it unlawful to 'come to hunt with Guns or Dogs, within any Inclosed Grounds, Islands, Peninsula's, or Necks fenced across from Water to Water, without Leave or Licence from the Proprietors thereof, first had and obtained.'" *Id.* (citation omitted).

- a 1763 New York law titled "An Act to Prevent Hunting with Fire-Arms in the City of New-York, and the Liberties Thereof," which "made it unlawful to 'carry, shoot, or discharge any Musket, Fowling-Piece, or other Fire-Arm

whatsoever, into, upon, or through any Orchard, Garden, CornField, or other inclosed Land whatsoever.'" ***Id.*** (citation omitted).

- a 1771 New Jersey law titled "An act for the preservation of deer, and other game, and to prevent trespassing with guns," which "provided that a person could not 'carry any gun on any lands not his own, … unless he hath license or permission in writing from the owner or owners, or legal possessor.'" ***Id.*** at 2051-52 (citation omitted).

¶221 Despite some obvious similarities between the historical laws and Hawaii's challenged law—namely that both generally prohibited persons from carrying guns onto land they did not own without the owner's permission—the Court nonetheless did not find the laws "relevantly similar" because the historical laws

> principally targeted unauthorized hunting. Their coverage differed sharply from that of the Hawaii law now before us. They applied to land where game could be found, not retail establishments that residents of cities and suburbs frequent as part of their daily routines. They had little if any impact on the Second Amendment's central objective: protecting the fundamental right to self-defense. And their obvious aim was to prevent the distinctive harms and risks associated with unauthorized hunting. That conduct often entailed the theft of private property: The poacher took game that the property owner might have otherwise harvested. It involved the firing of guns, which created a risk of inadvertently inflicting death or serious injury on the owner of the property, others who were authorized to use the property, and livestock. At a minimum, the sound of the gunshots could surprise, alarm, or disturb the tranquility of others on the property.

***Id.*** at 2052. The Court observed that "[t]he conduct restricted by the Hawaii law has none of these effects." ***Id.***

13

¶222 The Court identified a simple way to evaluate whether the analogues were "relevantly similar." *Id.* It did so by asking:

> Because it was accepted that prohibiting unauthorized hunting on private land was consistent with the Second Amendment right, can we infer that it is also consistent with that right to ban a person who is lawfully carrying a concealed handgun for self-defense from entering a gas station, coffee shop, grocery store, or other private property open to the public without express and unambiguous consent?

*Id.* The Court concluded that "[t]he question answers itself. The gap between the State's anti-poaching analogues and its new rule is just too wide." *Id.*

¶223 The *Wolford* Court also found unpersuasive two other state laws from the later Nineteenth Century, precedent that it considered to be "even weaker." *Id.* In addition to other shortcomings with the 1893 Oregon statute and 1865 Louisiana statute that the Court considered, the lack of widespread acceptance of such laws was fatal. As to the Oregon statute, the Court stated, "a lone statute adopted nearly a century after the adoption of the Second Amendment and well after the adoption of the Fourteenth Amendment sheds little if any light on the meaning of the Second Amendment right." *Id.* at 2052-53. The Louisiana statute "made it unlawful 'for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order.'" *Id.* at 2053 (citation omitted). Despite the obvious similarities between this statute and the contemporary Hawaii law, the Court was unmoved, determining that the Louisiana statute had "no probative value for present purposes. As we have said, in considering the probative value of a historical analogue, we must consider whether it was widespread, well-known, and widely accepted. Because this statute was

14

neither widespread nor widely accepted, it carries no weight." ***Id.*** (citation omitted).

¶224 To overcome the presumptive unconstitutionality of its requirements for the double (or single) locking of firearms by foster parents and that the firearms be stored unloaded, DCF proffers founding era laws that it claims lead to the conclusion that its restrictions are consistent with the right protected by the Second Amendment. It is incorrect.

¶225 DCF first points to founding era laws regulating the storage of gunpowder. But the Supreme Court has already determined that such laws do not support a requirement that a homeowner lock his/her firearms in his/her own home.

¶226 In ***Heller***, the Supreme Court considered the constitutionality of D.C.'s firearm law that, as the Court summarized it, "totally bans handgun possession in the home" and "also requires that any lawful firearm in the home be disassembled *or bound by a trigger lock* at all times, rendering it inoperable." ***Heller***, 554 U.S. at 628 (emphasis added). After determining that the handgun ban was invalid, the Court "also address[ed] the District's requirement (as applied to respondent's handgun) that firearms in the home be rendered and kept inoperable at all times." ***Id.*** at 630. The Court explained that the trigger-lock requirement "makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and is hence unconstitutional." ***Id.*** The Court expressed that the requirement that a firearm kept in the home must be "bound by a trigger lock"

rendered the firearm inoperable "for the purpose of immediate self-defense" and violated the Second Amendment. *Id* at 630, 635.[6]

¶227  In its brief, DCF contends that founding era "gunpowder storage" laws are relevantly similar to the locking and unloaded requirements of the rule at issue here. Notably for our purposes, the *Heller* Court shot down Justice Breyer's reliance in his dissent on "gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that access to gunpowder be kept in a special container or on the top floor of the home." *Id.* at 632. The Court recognized that the gunpowder-storage laws were about fire safety,[7] not impeding the ability to quickly and easily access and fire a loaded firearm, adding "[n]othing about those fire-safety laws undermines our analysis." *Id.* Similarly, here, founding era laws regulating the safe storage of gunpowder in a home or town in order to prevent fires and explosions are not "relevantly similar" to the "locked" and "loaded" restrictions of the rule in this case. Using the *Wolford* Court's "relevantly similar" test, we ask: "Because it was accepted that restricting the storage of gunpowder in a town or home was consistent with the Second Amendment right, can we infer that it is also consistent with that right to require foster parents to store a firearm locked and unloaded within their own home?" To

---

[6] Not unlike here, where DCF argues in briefing that we should interpret its new rule as requiring only a single lock, in *Heller*, "[t]he District [of Columbia] argue[d] that [the Court] should interpret this ["kept inoperable"/trigger lock] element of the statute to contain an exception for self-defense." 554 U.S. at 630. The *Heller* Court declined to so interpret the statute because the text indicated there was no self-defense exception therein. *Id.* Likewise, here, the majority errs in concluding the rule requires only one lock—i.e., if the firearm is in a safe, per paragraph (3)(c)—on the primary basis that DCF so represents, in D.C.F.'s efforts to save the rule from being held unconstitutional. *See* WIS. ADMIN. CODE § DCF 56.076(3)(a)-(c).

[7] DCF concedes, as it must, that the purpose—the "why"—of the gunpowder storage laws was to protect "communities from fire and explosion."

ask the question is to answer it. Gunpowder laws do not aid DCF in overcoming its burden of proving that its rule does not violate the Second Amendment.

¶228 In the "[g]unpowder storage" section of its brief, DCF included two sentences that one would expect to be its centerpiece if the cited laws really provided support for overcoming DCF's burden. DCF briefly directs us to 18th Century Massachusetts laws, 1782 Mass. Acts 119, ch. 46 and 1783 Mass. Acts 218, §§ 1-2, that "fined anyone who kept or possessed a loaded firearm in any house or building within Boston" and "permitted the seizure and sale of any loaded firearms found in the home," respectively. The *Heller* Court considered the same Massachusetts laws when it responded to Justice Breyer's dissent, which had relied on them, and found them unpersuasive for overcoming the government's burden. The Court noted that the

> statute's text and its prologue, which makes clear that the purpose of the prohibition [the "why"] was to eliminate the danger to firefighters posed by the 'depositing of loaded Arms' in buildings, give reason to doubt that colonial Boston authorities would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder (despite the law's application in that case).

*Heller*, 554 U.S. at 631-32. Importantly, the Court emphasized that it "would not stake [its] interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home." *Id.* at 632. The Massachusetts laws do not aid DCF.

¶229 DCF next places its hopes for overcoming its burden on college rules from the founding era that prohibited students from keeping a firearm on campus as well as, for example, keeping "a servant, horse or dog." This is a non-starter as

the nature of the restrictions is so vastly different. This is so because it is one thing for a *college* to regulate *its students* as to keeping a firearm (or a horse, dog, or servant) on the *college's own property*; it is entirely another thing for a *government* to regulate the keeping of firearms (or anything else for that matter) on a *homeowner's property*.

¶230 Sounding a related tune, the Fifth Circuit noted in ***United States v. Allam***, 140 F.4th 289 (5th Cir. 2025), that such founding era college rules affected only the college's students, "not the public at large. And none of these regulations applied off-campus," ***id.*** at 298. And the Eighth Circuit observed that such college rules were "procedural rules [that were] not … subject to constitutional limitations …. Universities had many practices that if compelled by the government, would have violated students' constitutional rights." ***Worth v. Jacobson***, 108 F.4th 677, 695 (8th Cir. 2024).

¶231 Because of the vast differences between prohibiting college students, whom the college permits to attend school there, from possessing firearms on the college's own campus and restricting foster parents in the manner in which they must keep their firearms stored in their own home, DCF's hopes in these college regulations go unfulfilled. We again ask the relevant question: "Because it was accepted that colleges restricting their students from keeping/possessing firearms on their own campus was consistent with the Second Amendment right, can we infer that it is also consistent with that right for the government to require a foster parent to keep his/her firearms unloaded and locked up in his/her own home?" Again, to ask the question is to answer it, in the negative.

¶232 DCF also directs us to a few post-Civil War laws, enacted more than a century after the adoption of the Second Amendment, that made it illegal to

18

provide a minor with a firearm and for minors to carry a firearm. Notably, it would have been obvious to all public lawmakers in the founding and post-Civil War eras that some homeowners with children could and did keep firearms in their homes. Yet, DCF directs us to no laws from these eras requiring that firearms in such homes be kept unloaded and under lock and key, much less under two locks and two keys (or combinations/codes). Reference to a few laws addressing a matter not included in this rule—minors possessing firearms and persons directly providing firearms to minors—also fails to satisfy DCF's burden.

¶233 The post-Civil War laws to which DCF refers us, of course, would be analogous to modern laws of, well, making it illegal to provide a minor with a firearm and for minors to carry a firearm. No such laws are at issue here. But even if a statute that penalized a person who provided a minor with a firearm or a statute that prohibited minors from carrying a firearm was considered to be relevantly similar to the DCF rule under challenge here, and it is not so considered by me, there certainly is no showing of widespread acceptance of such laws during any relevant time period. DCF also fails to meet its burden in this regard. A homeowner storing a firearm in his/her home for immediate self-defense is of a significantly different nature from a person directly providing a firearm to a youth or a youth carrying a firearm.

¶234 We do observe, however, that if such providing-a-minor-with-a-firearm and minors-carrying-a-firearm laws existed historically, one can readily see how easy it would have been for legislative bodies to also consider enacting laws requiring the locking of firearms within a home with children, related or unrelated, or requiring firearms to be unloaded within such a home. DCF directs us to no such laws.

¶235 DCF also tries to save its rule by attempting to analogize the Laffertys' private home, with a foster child residing there, to "sensitive places" where laws restricting firearms are permitted. DCF directs us to **Heller**, which stated,

> [a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places *such as schools and government buildings*, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626-27 (emphasis added).

¶236 In **Bruen**, the Court stated that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, *legislative assemblies*, *polling places*, and *courthouses*—we are also aware of no disputes regarding the lawfulness of such prohibitions." **Bruen**, 597 U.S. at 30 (emphasis added; citation omitted). The Court continued,

> [w]e therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Id.*

¶237 While it is not clear if the **Heller** Court was indicating that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" and "laws imposing conditions and qualifications on the

20

commercial sale of arms" were also "longstanding" or that only "prohibitions on the possession of firearms by felons and the mentally ill" were longstanding, even if we assume longstanding (i.e., "historical") laws considered "schools and government buildings" to be "sensitive places" in which firearm restrictions were more acceptable, this does not carry the day for DCF.  *See Heller*, 554 U.S. at 626-27.  Legislative assemblies, polling places, courthouses, other government buildings, and schools are all places where large numbers of diverse persons gather.  DCF fails to persuade that an individual's private home, where he/she lays his/her head at night, often in the company of a few, trusted family members, is sufficiently analogous to any of these to be considered a "sensitive place," even if the family is caring for a foster child or two in its home.[8]

¶238  I note that if DCF believes, as it does, that this court should view the right of a foster parent to keep a firearm in his/her home more restrictively because of, apparently, the more dangerous nature of foster children, one would expect DCF to refer us to founding era laws addressing a similar concern, if such analogous laws existed.  For example, while the foster system may not have existed when the Second Amendment was adopted, other persons generally considered to be of a more dangerous nature—such as persons with mental illness or a criminal record—residing in families' homes most certainly did.  If such laws existed in the founding or post-Civil War era, we would expect to see reference to at least some that prevented the keeping of a loaded weapon in a home, or required firearms to be locked up, where a person with mental illness or a violent criminal

---

[8] It seems that if a private home is legally considered to be a "sensitive place" if the homeowner is a foster parent, then firearms could be "altogether prohibited" from the home. *See Bruen*, 597 U.S. at 30.

record resided, on the theory that such persons would present a greater danger if they gained access to a firearm. DCF has shown us no such roughly analogous laws from which it could even begin to develop an argument that there were historical analogs to preventing foster parents from keeping a self-defense weapon in their home under the significant restrictions here.

¶239 For the foregoing reasons, I conclude that DCF's rule requires a foster parent to keep his/her firearm for self-and family-defense behind two locks, not just one; but whether one or two, DCF fails to overcome the presumption of unconstitutionality applicable to its new rule as to keeping a firearm locked up and unloaded. Specifically, DCF has not shown its new rules to be "'relevantly similar' to ones 'well-established' in the Nation's history." *See **Hemani***, 146 S. Ct. at 1686 (citation omitted). DCF fails to persuade that the significant impediments to self- and family-defense here are "consistent with the Nation's historical tradition of firearms regulation." *See **id.*** at 1685 (citation omitted). Accordingly, I concur in part and dissent in part.